# UNITED STATES *v.* MITCHELL ET AL.

No. 81–1748.   Argued March 1, 1983—Decided June 27, 1983

*Joshua I. Schwartz* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Dinkins, Deputy Solicitor General Claiborne,* and *Thomas H. Pacheco.*

*Charles A. Hobbs* argued the cause for respondents. With him on the brief was *Jerry C. Straus.**

JUSTICE MARSHALL delivered the opinion of the Court.

The principal question in this case is whether the United States is accountable in money damages for alleged breaches of trust in connection with its management of forest resources on allotted lands of the Quinault Indian Reservation.

I

A

In the 1850's, the United States undertook a policy of removing Indian tribes from large areas of the Pacific Northwest in order to facilitate the settlement of non-Indians.[1]

---

*Reid Peyton Chambers, Harry R. Sachse, Kenneth J. Guido, Jr., Donald J. Simon, Richard W. Hughes, George Forman, David Rapport, Robert J. Nordhaus, George E. Fettinger,* and *Steven L. Bunch* filed a brief for the Shoshone Tribe of the Wind River Indian Reservation et al. as *amici curiae* urging affirmance.

[1] See Act of June 5, 1850, 9 Stat. 437; Appropriation Act of Mar. 3, 1853, 10 Stat. 226, 238; *Quinault Allottee Assn.* v. *United States,* 202 Ct. Cl. 625, 628–269, 485 F. 2d 1391, 1392 (1973), cert. denied, 416 U. S. 961 (1974).

Pursuant to this policy, the first Governor and Superintendent of Indian Affairs of the Washington Territory began negotiations in 1855 with various tribes living on the west coast of the Territory. The negotiations culminated in a treaty between the United States and the Quinault and Quileute Tribes, 12 Stat. 971 (Treaty of Olympia). In the Treaty the Indians ceded to the United States a vast tract of land on the Olympic Peninsula in the State of Washington, and the United States agreed to set aside a reservation for the Indians.

In 1861 a reservation of about 10,000 acres was provisionally chosen for the tribes.[2] This tract proved undesirable because of its limited size and heavy forestation. The Quinault Agency superintendent subsequently recommended that since the coastal tribes drew their subsistence almost entirely from the water,[3] they should be collected on a reservation suitable for their fishing needs. Acting on this suggestion, President Grant issued an Executive Order on November 4, 1873, designating about 200,000 acres along the Washington coast as an Indian reservation.[4] The vast bulk of this land consisted of rain forest covered with huge, coniferous trees.

In 1905 the Federal Government began to allot the Quinault Reservation in trust to individual Indians under the General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U. S. C. § 331 *et seq.*[5] See also the Quinault Allotment Act

---

[2] See *Halbert v. United States*, 283 U. S. 753, 757 (1931).

[3] See generally *United States v. Washington*, 384 F. Supp. 312, 350–353 (WD Wash. 1974) (describing pretreaty role of fishing among Northwest Indians), aff'd, 520 F. 2d 676 (CA9 1975), cert. denied, 423 U. S. 1086 (1976).

[4] I C. Kappler, Indian Affairs 923 (2d ed. 1904). The Order declared that the reservation would be held for the use of the Quinault, Quileute, Hoh, Queets, "and other tribes of fish-eating Indians on the Pacific Coast." *Ibid.*

[5] Section 5 of the Act provided that the United States would hold the allotted land for 25 years "in trust for the sole use and benefit of the Indian to whom such allotment shall have been made." The period during which

of Mar. 4, 1911, ch. 246, 36 Stat. 1345. The Government initially determined that the forested areas of the Reservation were not to be allotted because they were not suitable for agriculture or grazing. In 1924, however, this Court concluded that the character of lands to be set apart for the Indians was not restricted by the General Allotment Act. *United States* v. *Payne*, 264 U. S. 446, 449. Thereafter, the forested lands of the Reservation were allotted. By 1935 the entire Reservation had been divided into 2,340 trust allotments, most of which were 80 acres of heavily timbered land. About a third of the Reservation has since gone out of trust, but the bulk of the land has remained in trust status.[6]

The forest resources on the allotted lands have long been managed by the Department of the Interior, which exercises "comprehensive" control over the harvesting of Indian timber. *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 145 (1980). The Secretary of the Interior has broad statutory authority over the sale of timber on reservations. See 25 U. S. C. §§ 406, 407. Sales of timber "shall be based upon a consideration of the needs and best interests of the Indian owner and his heirs," § 406(a), and the proceeds from such sales are to be used for the benefit of the Indians or transferred to the Indian owner, §§ 406(a), 407. Congress has directed the Secretary to adhere to principles of sustained-yield forestry on all Indian forest lands under his supervision. 25 U. S. C. § 466. Under these statutes, the Secretary has promulgated detailed regulations governing the management of Indian timber. 25 CFR pt. 163 (1983). The Secretary is authorized to deduct an administrative fee for his services from the timber revenues paid to Indian allottees. 25 U. S. C. §§ 406(a), 413.

---

the United States was to hold the allotted land was extended indefinitely by the Indian Reorganization Act of 1934, § 2, 48 Stat. 984, 25 U. S. C. § 462.

[6] See *Mitchell* v. *United States*, 219 Ct. Cl. 95, 97, 591 F. 2d 1300, 1300–1301 (1979) (en banc).

B

The respondents are 1,465 individuals owning interests in allotments on the Quinault Reservation, an unincorporated association of Quinault Reservation allottees, and the Quinault Tribe, which now holds some portions of the allotted lands. In 1971 respondents filed four actions that were consolidated in the Court of Claims. Jurisdiction was based on 28 U. S. C. §§ 1491 and 1505. Respondents sought to recover damages from the United States based on allegations of pervasive waste and mismanagement of timberlands on the Quinault Reservation. More specifically, respondents claimed that the Government (1) failed to obtain a fair market value for timber sold; (2) failed to manage timber on a sustained-yield basis; (3) failed to obtain any payment at all for some merchantable timber; (4) failed to develop a proper system of roads and easements for timber operations and exacted improper charges from allottees for maintenance of roads; (5) failed to pay any interest on certain funds from timber sales held by the Government and paid insufficient interest on other funds; and (6) exacted excessive administrative fees from allottees. Respondents assert that the alleged misconduct constitutes a breach of the fiduciary duty owed them by the United States as trustee under various statutes.

Six years after the suits were filed, the United States moved to dismiss for lack of jurisdiction, contending that the Court of Claims had no authority over claims based on a breach of trust. The court denied the motion, holding that the General Allotment Act created a fiduciary duty on the United States' part to manage the timber resources properly and thereby provided the necessary authority for recovery of damages against the United States. *Mitchell* v. *United States*, 219 Ct. Cl. 95, 591 F. 2d 1300 (1979) (en banc).

In *United States* v. *Mitchell*, 445 U. S. 535 (1980), this Court reversed the ruling of the Court of Claims, stating that the General Allotment Act "created only a limited trust relationship between the United States and the allottee that does

not impose any duty upon the Government to manage timber resources." *Id.*, at 542. We concluded that "[a]ny right of the respondents to recover money damages for Government mismanagement of timber resources must be found in some source other than [the General Allotment] Act." *Id.*, at 546. Since the Court of Claims had not considered respondents' assertion that other statutes render the United States answerable in money damages for the alleged mismanagement in this case, we remanded the case for consideration of these alternative grounds for liability. See *id.*, at 546, n. 7.

On remand, the Court of Claims once again held the United States subject to suit for money damages on most of respondents' claims. 229 Ct. Cl. 1, 664 F. 2d 265 (1981) (en banc). The court ruled that the timber management statutes, 25 U. S. C. §§ 406, 407, and 466, various federal statutes governing roadbuilding and rights of way, §§ 318 and 323–325, statutes governing Indian funds and Government fees, §§ 162a and 413, and regulations promulgated under these statutes imposed fiduciary duties upon the United States in its management of forested allotted lands. The court concluded that the statutes and regulations implicitly required compensation for damages sustained as a result of the Government's breach of its duties. Thus, the court held that respondents could proceed on their claims.

Because the decision of the Court of Claims raises issues of substantial importance concerning the liability of the United States,[7] we granted the Government's petition for certiorari. 457 U. S. 1104 (1982). We affirm.

## II

Respondents have invoked the jurisdiction of the Court of Claims under the Tucker Act, 28 U. S. C. § 1491, and its counterpart for claims brought by Indian tribes, 28 U. S. C.

---

[7] The Government has informed us that the damages claimed in this suit alone may amount to $100 million. Pet. for Cert. 24.

§ 1505, known as the Indian Tucker Act.[8]   The Tucker Act states in pertinent part:

> "The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.[9]   The terminology employed in some of our prior decisions has unfortunately generated some confusion as to whether the Tucker Act constitutes a waiver of sovereign immunity.   The time has come to resolve this confusion.   For the reasons set forth below, we conclude that by giving the Court of Claims jurisdiction over specified types of claims against the United States,[10] the Tucker Act constitutes a waiver of sovereign immunity with respect to those claims.

### A

Before 1855 no general statute gave the consent of the United States to suit on claims for money damages; the only recourse available to private claimants was to petition Congress for relief.[11]   In order to relieve the pressure caused by

---

[8] Section 24 of the Indian Claims Commission Act, 28 U. S. C. § 1505, provides tribal claimants the same access to the Court of Claims provided to individual claimants by 28 U. S. C. § 1491.   See *United States* v. *Mitchell,* 445 U. S. 535, 538–540 (1980).

[9] See *United States* v. *Sherwood,* 312 U. S. 584, 586 (1941); 14 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3654, pp. 156–157 (1976).

[10] The Tucker Act provided concurrent jurisdiction in the district courts over claims not exceeding $10,000.   See 28 U. S. C. § 1346(a)(2).

[11] See P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 98 (2d ed. 1973); Richardson, History, Jurisdiction, and Practice of the Court of Claims, 17 Ct. Cl. 3, 3–4 (1882).

the volume of private bills and to avoid the delays and inequities of the private bill procedure, Congress created the Court of Claims. Act of Feb. 24, 1855, 10 Stat. 612. The 1855 Act empowered that court to hear claims and report its findings to Congress and to submit a draft of a private bill in each case which received a favorable decision. § 7, 10 Stat. 613. The limited powers initially conferred upon the court failed to relieve Congress from "the laborious necessity of examining the merits of private bills." *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 553 (1962) (opinion of Harlan, J.). Thus, in his State of the Union Message of 1861, President Lincoln recommended that the court be authorized to render final judgments. He declared that it is "as much the duty of Government to render prompt justice against itself, in favor of citizens, as it is to administer the same between private individuals." Cong. Globe, 37th Cong., 2d Sess., App. 2 (1861). Congress adopted President Lincoln's recommendation and made the court's judgments final. Act of Mar. 3, 1863, 12 Stat. 765.[12]

In 1886 Representative John Randolph Tucker introduced a bill to revise in several respects the jurisdiction and procedures of the Court of Claims and to replace most provisions of the 1855 and 1863 Acts. H. R. 6974, 49th Cong., 1st Sess. (1886). The House Judiciary Committee reported that the bill was a "comprehensive measure by which claims against the United States may be heard and determined." H. R. Rep. No. 1077, 49th Cong., 1st Sess., 1 (1886). The measure was designed to "give the people of the United States what

---

[12] Section 14 of the 1863 Act provided that "no money shall be paid out of the treasury for any claim passed upon by the court of claims till after an appropriation therefor shall be estimated for by the Secretary of the Treasury." 12 Stat. 768. In *Gordon* v. *United States*, 2 Wall. 561 (1865), this Court dismissed an appeal from a judgment of the Court of Claims for want of jurisdiction, holding that § 14 gave the Secretary a revisory authority over the court inconsistent with its exercise of judicial power. Congress promptly repealed the provision, Act of Mar. 17, 1866, ch. 19, § 1, 14 Stat. 9. See *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 554 (1962) (opinion of Harlan, J.).

every civilized nation of the world has already done—the
right to go into the courts to seek redress against the
Government for their grievances." 18 Cong. Rec. 2680
(1887) (remarks of Rep. Bayne). See *id.*, at 622 (remarks of
Rep. Tucker); *id.*, at 2679 (colloquy between Reps. Tucker
and Townshend); *id.*, at 2680 (remarks of Rep. Holman).
The eventual enactment thus "provide[d] for the bringing of
suits against the Government of the United States." Act of
Mar. 3, 1887, 24 Stat. 505.

The Indian Tucker Act, 28 U. S. C. § 1505, has a similar
history. An early amendment to the original enactment
creating the Court of Claims had excluded claims by Indian
tribes. Act of Mar. 3, 1863, § 9, 12 Stat. 767. As a result,
Congress eventually confronted a "vast and growing burden"
resulting from the large number of tribes seeking special
jurisdictional Acts. H. R. Rep. No. 1466, 79th Cong., 1st
Sess., 6 (1945). Congress responded by conferring juris-
diction on the Court of Claims to hear any tribal claim "of a
character which would be cognizable in the Court of Claims if
the claimant were not an Indian tribe." *Id.*, at 13. As the
House sponsor of the Act stated, an important goal of the Act
was to ensure that it would "never again be necessary to pass
special Indian jurisdictional acts in order to permit the Indi-
ans to secure a court adjudication on any misappropriations
of Indian funds or of any other Indian property by Federal
officials that might occur in the future." 92 Cong. Rec. 5313
(1946) (statement of Rep. Jackson). Indians were to be
given "their fair day in court so that they can call the various
Government agencies to account on the obligations that the
Federal government assumed." *Id.*, at 5312.[13] The House

---

[13] See 92 Cong. Rec. 5312 (1946) (statement of Rep. Jackson) ("The Inte-
rior Department itself has suggested that it ought not be in a position
where its employees can mishandle funds and lands of a national trustee-
ship without complete accountability"). See also Hearings on H. R. 1198
and H. R. 1341 before the House Committee on Indian Affairs, 79th Cong.,
1st Sess., 130 (1945) (statement of Assistant Solicitor Cohen).

Report stressed the same point: "If we fail to meet these obligations by denying access to the courts when trust funds have been improperly dissipated or other fiduciary duties have been violated, we compromise the national honor of the United States." H. R. Rep. No. 1466, *supra*, at 5.

For decades this Court consistently interpreted the Tucker Act as having provided the consent of the United States to be sued *eo nomine* for the classes of claims described in the Act. See, *e. g., Schillinger* v. *United States*, 155 U. S. 163, 166–167 (1894); *Belknap* v. *Schild*, 161 U. S. 10, 17 (1896); *Dooley* v. *United States*, 182 U. S. 222, 227–228 (1901); *Reid* v. *United States*, 211 U. S. 529, 538 (1909); *United States* v. *Sherwood*, 312 U. S. 584, 590 (1941); *Dalehite* v. *United States*, 346 U. S. 15, 25, n. 10 (1953); *Soriano* v. *United States*, 352 U. S. 270, 273 (1957). In at least two recent decisions this Court explicitly stated that the Tucker Act effects a waiver of sovereign immunity. *Army & Air Force Exchange Service* v. *Sheehan*, 456 U. S. 728, 734 (1982); *Hatzlachh Supply Co.* v. *United States*, 444 U. S. 460, 466 (1980) *(per curiam)*. These decisions confirm the unambiguous thrust of the history of the Act.

The existence of a waiver is readily apparent in claims founded upon "any express or implied contract with the United States." 28 U. S. C. § 1491. The Court of Claims' jurisdiction over contract claims against the Government has long been recognized, and Government liability in contract is viewed as perhaps "the widest and most unequivocal waiver of federal immunity from suit." Developments in the Law—Remedies Against the United States and Its Officials, 70 Harv. L. Rev. 827, 876 (1957). See also 14 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3656, p. 202 (1976). The source of consent for such suits unmistakably lies in the Tucker Act. Otherwise, it is doubtful that *any* consent would exist, for no contracting officer or other official is empowered to consent to suit against the United

States.[14]  The same is true for claims founded upon executive regulations.  Indeed, the Act makes absolutely no distinction between claims founded upon contracts and claims founded upon other specified sources of law.

In *United States* v. *Testan,* 424 U. S. 392, 398, 400 (1976), and in *United States* v. *Mitchell,* 445 U. S., at 538, this Court employed language suggesting that the Tucker Act does not effect a waiver of sovereign immunity.  Such language was not necessary to the decision in either case.  See *infra,* at 217–218.  Without in any way questioning the result in either case, we conclude that this isolated language should be disregarded.  If a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit.

## B

It nonetheless remains true that the Tucker Act "'does not create any substantive right enforceable against the United States for money damages.'"  *United States* v. *Mitchell, supra,* at 538, quoting *United States* v. *Testan, supra,* at 398. A substantive right must be found in some other source of law, such as "the Constitution, or any Act of Congress, or any regulation of an executive department."  28 U. S. C. § 1491.  Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States, see *United States* v. *King,* 395 U. S. 1, 2–3 (1969),[15] and the claimant must demonstrate that the source of sub-

---

[14] See *United States* v. *N. Y. Rayon Importing Co.,* 329 U. S. 654, 660 (1947); *United States* v. *Shaw,* 309 U. S. 495, 501 (1940); *Carr* v. *United States,* 98 U. S. 433, 438 (1879).

[15] The Court of Claims also has limited authority to issue declaratory judgments.  See 28 U. S. C. § 1507 (actions under § 7428 of the Internal Revenue Code of 1954); *Austin* v. *United States,* 206 Ct. Cl. 719, 723 (declaratory judgments "tied and subordinate to a monetary award"), cert. denied, 423 U. S. 911 (1975).

stantive law he relies upon "'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *United States* v. *Testan, supra,* at 400, quoting *Eastport S.S. Corp.* v. *United States,* 178 Ct. Cl. 599, 607, 372 F. 2d 1002, 1009 (1967).[16]

For example, in *United States* v. *Testan, supra,* two Government attorneys contended that they were entitled to a higher salary grade under the Classification Act,[17] and to an award of backpay under the Back Pay Act[18] for the period during which they were classified at a lower grade. This Court concluded that neither the Classification Act nor the Back Pay Act could fairly be interpreted as requiring compensation for wrongful classifications. See 424 U. S., at 398–407. Particularly in light of the "established rule that one is not entitled to the benefit of a position until he has been duly appointed to it," *id.,* at 402, the Classification Act does not support a claim for money damages. While the Back Pay Act does provide a basis for money damages as a remedy "in carefully limited circumstances" such as wrongful reductions in grade, *id.,* at 404, it does not apply to wrongful classifications. *Id.,* at 405.

Similarly, in *United States* v. *Mitchell, supra,* this Court concluded that the General Allotment Act does not confer a right to recover money damages against the United States. While §5 of the Act provided that the United States would hold land "in trust" for Indian allottees, 25 U. S. C. §348, we held that the Act creates only a limited trust relationship. 445 U. S., at 542. The trust language of the Act does not

---

[16] As the *Eastport* decision recognized, the substantive source of law may grant the claimant a right to recover damages either "expressly or by implication." 178 Ct. Cl., at 605, 372 F. 2d, at 1007. See also *Ralston Steel Corp.* v. *United States,* 169 Ct. Cl. 119, 125, 340 F. 2d 663, 667, cert. denied, 381 U. S. 950 (1965).

[17] 5 U. S. C. §5101.

[18] 5 U. S. C. §5596.

impose any fiduciary management duties or render the United States answerable for breach thereof, but only prevents improvident alienation of the allotted lands and assures their immunity from state taxation. *Id.*, at 544.

Thus, for claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department," 28 U. S. C. § 1491, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained. In undertaking this inquiry, a court need not find a separate waiver of sovereign immunity in the substantive provision, just as a court need not find consent to suit in "any express or implied contract with the United States." *Ibid.* The Tucker Act itself provides the necessary consent.

Of course, in determining the general scope of the Tucker Act, this Court has not lightly inferred the United States' consent to suit. See *United States* v. *King, supra*, at 4–5 (Court of Claims lacks general authority to issue declaratory judgment); *Soriano* v. *United States*, 352 U. S., at 276 (nontolling of limitations beyond statutory provisions). For example, although the Tucker Act refers to claims founded upon any implied contract with the United States, we have held that the Act does not reach claims based on contracts implied in law, as opposed to those implied in fact. *Merritt* v. *United States*, 267 U. S. 338, 341 (1925).

In this case, however, there is simply no question that the Tucker Act provides the United States' consent to suit for claims founded upon statutes or regulations that create substantive rights to money damages. If a claim falls within this category, the existence of a waiver of sovereign immunity is clear. The question in this case is thus analytically distinct: whether the statutes or regulations at issue can be interpreted as requiring compensation. Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a

second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity. See *United States* v. *Emery, Bird, Thayer Realty Co.*, 237 U. S. 28, 32 (1915). "'The exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced.'" *United States* v. *Aetna Casualty & Surety Co.*, 338 U. S. 366, 383 (1949), quoting *Anderson* v. *John L. Hayes Construction Co.*, 243 N. Y. 140, 147, 153 N. E. 28, 29–30 (1926) (Cardozo, J.).[19]

## III

Respondents have based their money claims against the United States on various Acts of Congress and executive department regulations. We begin by describing these sources of substantive law. We then examine whether they can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties they impose.

## A

The Secretary of the Interior's pervasive role in the sales of timber from Indian lands began with the Act of June 25, 1910, §§ 7, 8, 36 Stat. 857, as amended, 25 U. S. C. §§ 406, 407. Prior to that time, Indians had no right to sell timber on reservation land,[20] and there existed "'no general law under which authority for the sale of timber on Indian lands, whether allotted or unallotted, can be granted.'" H. R. Rep. No. 1135, 61st Cong., 2d Sess., 3 (1910) (quoting letter of the Secretary of the Interior). Congress recognized that this situation was undesirable "'because in many instances the timber is the only valuable part of the allotment or is the

---

[19] Cf. *Block* v. *Neal*, 460 U. S. 289, 298 (1983); *Indian Towing Co.* v. *United States*, 350 U. S. 61, 69 (1955).

[20] See *United States* v. *Cook*, 19 Wall. 591 (1874); *Pine River Logging Co.* v. *United States*, 186 U. S. 279 (1902); 19 Op. Atty. Gen. 194 (1888).

220

only source from which funds can be obtained for the support of the Indian or the improvement of his allotment.'" *Ibid.* The 1910 Act empowered the Secretary to sell timber on unallotted lands and apply the proceeds of the sales for the benefit of the Indians, §7, and authorized the Secretary to consent to sales by allottees, with the proceeds to be paid to the allottees or disposed of for their benefit, §8. Congress thus sought to provide for harvesting timber "in such a manner as to conserve the interests of the people on the reservations, namely, the Indians." 45 Cong. Rec. 6087 (1910) (remarks of Rep. Saunders).

From the outset, the Interior Department recognized its obligation to supervise the cutting of Indian timber. In 1911, the Department's Office of Indian Affairs promulgated detailed regulations covering its responsibilities in "managing the Indian forests so as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests." U. S. Office of Indian Affairs, Regulations and Instructions for Officers in Charge of Forests on Indian Reservations 4 (1911). The regulations addressed virtually every aspect of forest management, including the size of sales, contract procedures, advertisements and methods of billing, deposits and bonding requirements, administrative fee deductions, procedures for sales by minors, allowable heights of stumps, tree marking and scaling rules, base and top diameters of trees for cutting, and the percentage of trees to be left as a seed source. *Id.,* at 8–28. The regulations applied to allotted as well as tribal lands, and the Secretary's approval of timber sales on allotted lands was explicitly conditioned upon compliance with the regulations. *Id.,* at 9.

Over time, deficiencies in the Interior Department's performance of its responsibilities became apparent. Accordingly, as part of the Indian Reorganization Act of 1934, 48 Stat. 984, Congress imposed even stricter duties upon the Government with respect to Indian timber management. In

§ 6 of the Act, now codified as 25 U. S. C. § 466, Congress expressly directed that the Interior Department manage Indian forest resources "on the principle of sustained-yield management." Representative Howard, cosponsor of the Act and Chairman of the House Committee on Indian Affairs, explained that the purpose of the provision was "to assure a proper and permanent management of the Indian forest" under modern sustained-yield methods so as to "assure that the Indian forests will be permanently productive and will yield continuous revenues to the tribes." 78 Cong. Rec. 11730 (1934). See *United States* v. *Anderson,* 625 F. 2d 910, 915 (CA9 1980), cert. denied, 450 U. S. 920 (1981). Referring to the relationship between the Indians and the Government as a "sacred trust," Representative Howard stated that "[t]he failure of their governmental guardian to conserve the Indians' land and assets and the consequent loss of income or earning power, has been the principal cause of the present plight of the average Indian." 78 Cong. Rec., at 11726.[21]

Regulations promulgated under the Act required the preservation of Indian forest lands in a perpetually productive state, forbade the clear-cutting of large contiguous areas, called for the development of long-term working plans for all major reservations, required adequate provision for new growth when mature timber was removed, and required the regulation of run-off and the minimization of erosion.[22] The regulatory scheme was designed to assure that the Indians

---

[21] John Collier, the Commissioner of Indian Affairs and a principal author of the Act, had testified:

"[T]here must be a constructive handling of Indian timber. We have got to stop the slaughtering of Indian timber lands, to operate them on a perpetual yield basis and the bill expressly directs that this principle of conservation shall be applied throughout." Hearings on H. R. 7902 before the House Committee on Indian Affairs, 73d Cong., 2d Sess., pt. 1, p. 35 (1934).

[22] The Bureau of Indian Affairs' 1936 General Forest Regulations remain essentially unchanged within 25 CFR pt. 163 (1983).

receive "'the benefit of whatever profit [the forest] is capable of yielding.'" *White Mountain Apache Tribe* v. *Bracker*, 448 U. S., at 149 (quoting 25 CFR § 141.3(a)(3) (1979)).

In 1964 Congress amended the timber provisions of the 1910 Act, again emphasizing the Secretary of the Interior's management duties. Act of Apr. 30, 1964, 78 Stat. 186. As to sales of timber on allotted lands, the Secretary was directed to consider "the needs and best interests of the Indian owner and his heirs." 25 U. S. C. § 406(a). In performing this duty, the Secretary was specifically required to take into account

> "(1) the state of growth of the timber and the need for maintaining the productive capacity of the land for the benefit of the owner and his heirs, (2) the highest and best use of the land, including the advisability and practicality of devoting it to other uses for the benefit of the owner and his heirs, and (3) the present and future financial needs of the owner and his heirs." *Ibid.*

See also 25 U. S. C. § 407 (timber sales on unallotted trust lands).

The timber management statutes, 25 U. S. C. §§ 406, 407, 466, and the regulations promulgated thereunder, 25 CFR pt. 163 (1983), establish the "comprehensive" responsibilities of the Federal Government in managing the harvesting of Indian timber. *White Mountain Apache Tribe* v. *Bracker*, 448 U. S., at 145. The Department of the Interior—through the Bureau of Indian Affairs—"exercises literally daily supervision over the harvesting and management of tribal timber." *Id.*, at 147.[23] Virtually every stage of the process is under federal control.[24]

---

[23] By virtue of the Act of Feb. 14, 1920, § 1, 41 Stat. 415, as amended by the Act of Mar. 1, 1933, ch. 158, 47 Stat. 1417, the Secretary of the Interior is authorized to collect "reasonable fees" from Indian timber sale proceeds to cover the cost of the management and sale of the Indians' timber. 25 U. S. C. § 413. Sections 406 and 407, as amended in 1964, both provide for deductions of administrative expenses "to the extent permissible under

The Department exercises comparable control over grants of rights-of-way on Indian lands held in trust.[25] The Secretary is empowered to grant rights-of-way for all purposes across trust land, 25 U. S. C. § 323, provided that he obtains the consent of the tribal or individual Indian landowner, § 324,[26] and that the Indian owners are paid appropriate compensation, § 325. Regulations detail the scope of federal supervision. 25 CFR pt. 169 (1983).[27] For example, an applicant for a right-of-way must deposit with the Secretary an amount not less than the fair market value of the rights granted, plus an amount to cover potential damages associated with activity on the right-of-way. The Secretary must determine the adequacy of the compensation, and the amounts deposited must be held in a special account for distribution to Indian landowners. See 25 CFR §§ 169.12, 169.14 (1983).[28]

---

section 413." See also 25 CFR § 163.18 (1983). Respondents have asserted that administrative fee deductions were excessive or improper in several respects. The Court of Claims concluded that there is "undoubted consent-to-suit for such claims that the Government illegally kept some of the Indians' own money or property." 229 Ct. Cl. 1, 15, 664 F. 2d 265, 274 (1981), citing United States v. Testan, 424 U. S. 392, 400–401 (1976); Eastport S.S. Corp. v. United States, 178 Ct. Cl. 599, 605–606, 372 F. 2d 1002, 1007–1008 (1967). The Government does not appear to dispute this conclusion. Brief for United States 33, n. 27.

[24] The Secretary even has authority to invest tribal and individual Indian funds held in trust in banks, bonds, notes, or other public debt obligations of the United States if deemed advisable and for the best interest of the Indians. Act of June 24, 1938, 52 Stat. 1037, 25 U. S. C. § 162a. In this case the funds maintained on behalf of individual allottees were derived primarily from timber sales.

[25] See Act of Feb. 5, 1948, 62 Stat. 17, codified in part at 25 U. S. C. §§ 323–325. See also Act of May 26, 1928, 45 Stat. 750, 25 U. S. C. § 318a (road building).

[26] Rights-of-way over lands of individual Indians may be granted without the consent of the owners under certain specific circumstances. § 324.

[27] Such regulations have a long history. See 25 CFR pt. 256 (1949).

[28] See also 25 CFR § 169.3 (1983) (consent of Indian landowners to grants of rights-of-way); § 169.5 (specifying required elements of agreements be-

## B

In *United States* v. *Mitchell*, 445 U. S., at 542, this Court recognized that the General Allotment Act creates a trust relationship between the United States and Indian allottees but concluded that the trust relationship was limited. We held that the Act could not be read "as establishing that the United States has a fiduciary responsibility for management of allotted forest lands." *Id.*, at 546. In contrast to the bare trust created by the General Allotment Act, the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities.

The language of these statutory and regulatory provisions directly supports the existence of a fiduciary relationship. For example, § 8 of the 1910 Act, as amended, expressly mandates that sales of timber from Indian trust lands be based upon the Secretary's consideration of "the needs and best interests of the Indian owner and his heirs" and that proceeds from such sales be paid to owners "or disposed of for their benefit." 25 U. S. C. § 406(a). Similarly, even in its earliest regulations, the Government recognized its duties in "managing the Indian forests so as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests." U. S. Office of Indian Affairs, Regulations and Instructions for Officers in Charge of Forests on Indian Reservations 4 (1911). Thus, the Government has "expressed a firm desire that the Tribe should retain the benefits derived from the harvesting and sale of reserva-

---

tween Secretary and applicants, including stipulation that upon termination of the right-of-way the applicant will restore land to its original condition so far as is reasonably possible). As to roads on Indian reservations, respondents have alleged improper deduction of road maintenance costs as a charge against the allottees' timber payments.

tion timber." *White Mountain Apache Tribe* v. *Bracker*, 448 U. S., at 149.[29]

Moreover, a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds).[30] "[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." *Navajo Tribe of Indians* v. *United States*, 224 Ct. Cl. 171, 183, 624 F. 2d 981, 987 (1980).

Our construction of these statutes and regulations is reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people. This Court has previously emphasized "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." *Seminole Nation* v. *United States*, 316 U. S. 286, 296 (1942). This principle has long dominated the Government's dealings with Indians. *United States* v. *Mason*, 412 U. S. 391, 398 (1973); *Minnesota* v. *United States*, 305 U. S. 382, 386 (1939); *United States* v. *Shoshone Tribe*, 304 U. S. 111, 117–118 (1938); *United States* v. *Candelaria*, 271 U. S. 432, 442 (1926); *McKay* v. *Kalyton*, 204 U. S. 458, 469 (1907); *Minnesota* v. *Hitchcock*, 185 U. S. 373, 396 (1902); *United States* v.

---

[29] The pattern of pervasive federal control evident in the area of timber sales and timber management applies equally to grants of rights-of-way and to management of Indian funds. See *supra*, at 223, and n. 24.

[30] See Restatement (Second) of Trusts § 2, Comment *h*, p. 10 (1959).

*Kagama*, 118 U. S. 375, 382–384 (1886); *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831).

Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties. It is well established that a trustee is accountable in damages for breaches of trust. See Restatement (Second) of Trusts §§ 205–212 (1959); G. Bogert, Law of Trusts and Trustees § 862 (2d ed. 1965); 3 A. Scott, Law of Trusts § 205 (3d ed. 1967). This Court and several other federal courts have consistently recognized that the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust.[31]

The recognition of a damages remedy also furthers the purposes of the statutes and regulations, which clearly require

---

[31] See, *e. g.*, *Seminole Nation* v. *United States*, 316 U. S. 286, 295–300 (1942); *United States* v. *Creek Nation*, 295 U. S. 103, 109–110 (1935); *Moose* v. *United States*, 674 F. 2d 1277, 1281 (CA9 1982); *Whiskers* v. *United States*, 600 F. 2d 1332, 1335 (CA10 1979), cert. denied, 444 U. S. 1078 (1980); *Coast Indian Community* v. *United States*, 213 Ct. Cl. 129, 152–156, 550 F. 2d 639, 652–654 (1977); *Cheyenne-Arapaho Tribes* v. *United States*, 206 Ct. Cl. 340, 345, 512 F. 2d 1390, 1392 (1975); *Mason* v. *United States*, 198 Ct. Cl. 599, 613–616, 461 F. 2d 1364, 1372–1373 (1972), rev'd on other grounds, 412 U. S. 391 (1973); *Navajo Tribe* v. *United States*, 176 Ct. Cl. 502, 507, 364 F. 2d 320, 322 (1966); *Klamath & Modoc Tribes* v. *United States*, 174 Ct. Cl. 483, 490–491 (1966); *Menominee Tribe* v. *United States*, 102 Ct. Cl. 555, 562, 59 F. Supp. 137, 140 (1945); *Menominee Tribe* v. *United States*, 101 Ct. Cl. 10, 18–20 (1944); *Smith* v. *United States*, 515 F. Supp. 56, 60 (ND Cal. 1978); *Manchester Band of Pomo Indians, Inc.* v. *United States*, 363 F. Supp. 1238, 1243–1248 (ND Cal. 1973).

that the Secretary manage Indian resources so as to generate proceeds for the Indians. It would be anomalous to conclude that these enactments create a right to the value of certain resources when the Secretary lives up to his duties, but no right to the value of the resources if the Secretary's duties are not performed. "Absent a retrospective damages remedy, there would be little to deter federal officials from violating their trust duties, at least until the allottees managed to obtain a judicial decree against future breaches of trust." *United States* v. *Mitchell*, 445 U. S., at 550 (WHITE, J., dissenting). Cf. H. R. Rep. No. 1466, 79th Cong., 1st Sess., 5 (1945).

The Government contends that violations of duties imposed by the various statutes may be cured by actions for declaratory, injunctive, or mandamus relief against the Secretary, although it concedes that sovereign immunity might have barred such suits before 1976.[32] Brief for United States 40. In this context, however, prospective equitable remedies are totally inadequate. To begin with, the Indian allottees are in no position to monitor federal management of their lands on a consistent basis. Many are poorly educated, most are absentee owners, and many do not even know the exact physical location of their allotments. Indeed, it was the very recognition of the inability of the Indians to oversee their interests that led to federal management in the first place. A trusteeship would mean little if the beneficiaries were required to supervise the day-to-day management of their estate by their trustee or else be precluded from recovery for mismanagement.

In addition, by the time Government mismanagement becomes apparent, the damage to Indian resources may be so severe that a prospective remedy may be next to worthless. For example, if timber on an allotment has been destroyed

---

[32] See *Naganab* v. *Hitchcock*, 202 U. S. 473, 475–476 (1906). In 1976 Congress enacted a general consent to such suits. See 5 U. S. C. § 702.

through Government mismanagement, it will take many years for nature to restore the timber. As this Court has observed:

> "Once logged off, the land is of little value. The land no longer serves the purpose for which it was by treaty set aside to [the allottee's] ancestors, and for which it was allotted to him. It can no longer be adequate to his needs and serve the purpose of bringing him finally to a state of competency and independence." *Squire* v. *Capoeman*, 351 U. S. 1, 10 (1956) (footnote omitted).

We thus conclude that the statutes and regulations at issue here can fairly be interpreted as mandating compensation by the Federal Government for violations of its fiduciary responsibilities in the management of Indian property. The Court of Claims[33] therefore has jurisdiction over respondents' claims for alleged breaches of trusts.

## IV

The judgment of the Court of Claims is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, with whom JUSTICE REHNQUIST and JUSTICE O'CONNOR join, dissenting.

The controlling law in this case is clear. Speaking for the Court in *United States* v. *Mitchell*, 445 U. S. 535 (1980) *(Mitchell I)*, JUSTICE MARSHALL reaffirmed the general

---

[33] In the Federal Courts Improvement Act of 1982, 28 U. S. C. § 41 (1982 ed.), Congress merged the Court of Claims and the Court of Customs and Patent Appeals into a new federal court of appeals, the United States Court of Appeals for the Federal Circuit. The Act also created a new Art. I trial forum known as the United States Claims Court, which inherited the trial jurisdiction of the Court of Claims. 28 U. S. C. § 171 (1982 ed.). See S. Rep. No. 97–275, p. 2 (1981).

principle that a cause of action for damages against the United States " 'cannot be implied but must be unequivocally expressed.' " *Id.*, at 538 (quoting *United States* v. *King*, 395 U. S. 1, 4 (1969)). See *United States* v. *Hopkins*, 427 U. S. 123, 128 (1976) ("specific command of statute or authorized regulation"); *Lehman* v. *Nakshian*, 453 U. S. 156, 170 (1981) (BRENNAN, J., dissenting). Where, as here, a claim for money damages is predicated upon an alleged statutory violation, the rule is that the statute does not create a cause of action for damages unless the statute " 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' " *United States* v. *Testan*, 424 U. S. 392, 402 (1976) (quoting *Eastport S.S. Corp.* v. *United States*, 178 Ct. Cl. 599, 607, 372 F. 2d 1002, 1008, 1009 (1967)). See, *e. g., Army & Air Force Exchange Service* v. *Sheehan*, 456 U. S. 728, 739–740 (1982) ("*Testan* [held] that the Tucker Act provides a remedy only where damages claims against the United States have been authorized *explicitly*") (emphasis added); *id.*, at 739 (damages remedy available where the regulations "specifically authorize awards of money damages"); *id.*, at 741 (reaffirming that an action for damages under the Tucker Act may not be premised upon "regulations . . . which do not explicitly authorize damages awards"). In sum, whether the United States has created a cause of action turns upon the intent of Congress, not the inclinations of the courts. See *United States* v. *Shaw*, 309 U. S. 495, 500 (1940) ("specific statutory consent"); *Munro* v. *United States*, 303 U. S. 36, 41 (1938) ("only by permission").

Today, the Court appears disinterested in the intent of Congress. It has effectively reversed the presumption that absent "affirmative statutory authority," *United States* v. *United States Fidelity & Guaranty Co.*, 309 U. S. 506, 514 (1940), the United States has not consented to be sued for damages. It has substituted a contrary presumption, applicable to the conduct of the United States in Indian affairs,

that the United States has consented to be sued for statutory violations and other departures from the rules that govern private fiduciaries. I dissent from the Court's departure from long-settled principles.

I

The Court does not—and clearly cannot—contend that any of the statutes standing alone reflects the necessary legislative authorization of a damages remedy. None of the statutes contains any "provision . . . that expressly makes the United States liable" for its alleged mismanagement of Indian forest resources and their proceeds or grants a right of action "with specificity." *Testan, supra,* at 399, 400. Indeed, nothing in the timber-sales statutes, 25 U. S. C. §§ 406, 407,[1] 466,[2] the road and right-of-way statutes, §§ 318a, 323–325,[3]

---

[1] The only monetary obligation imposed upon the Secretary by § 406 or § 407 is to pay the actual "proceeds" of timber sales to the owners of the land. Thus, while it may well be that those sections would permit an action to compel the Secretary to pay over unlawfully retained proceeds, see *United States v. Testan,* 424 U. S., at 401, no statutory basis exists for extending that remedy to profits that arguably or ideally should have been, but were not, earned by the Secretary. On the contrary, the statutory recognition of a right to receive the "proceeds" of sales conducted suggests that this is the limit of any damages action implicitly authorized by Congress. See *Middlesex County Sewerage Authority v. National Sea Clammers Assn.,* 453 U. S. 1, 14–15, 20–21 (1981). Cf. *United States v. Erika, Inc.,* 456 U. S. 201, 208 (1982).

[2] Section 466 merely requires the Secretary to "make rules and regulations for the operation and management of Indian forestry units on the principle of sustained-yield management."

[3] Section 318a authorizes the appropriation of funds for building of roads on Indian reservations. It would be a radical change in the law of sovereign immunity to hold that a routine authorization statute allows individuals who might benefit from appropriations to bring an action to recover damages. And although § 325 requires "the payment of such compensation as the Secretary of the Interior shall determine to be just," it does not follow that damages for failure to secure more generous compensation are available. Indeed, the explicit statutory recognition of the Secretary's

or the interest statute, § 162a,[4] addresses in any respect the institution of damages actions against the United States. Nor is there any indication in the legislative history of the statutes that Congress intended to consent to damages actions for mismanagement of Indian assets by enacting these provisions.[5] The Court does not suggest otherwise.

The Court for the most part rests its decision on the implausible proposition that statutes that do not in terms create a right to payment of money nonetheless may support a damages action against the United States. This view simply cannot be reconciled with the decisions in *Testan* and

---

authority to determine the amount of compensation militates against any damages remedy for insufficient compensation. See *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 644–645 (1981); *Plumbers & Pipefitters* v. *Plumbers & Pipefitters*, 452 U. S. 615, 630 (1981) (BURGER, C. J., dissenting).

[4] Section 162a affords the Secretary substantial discretion respecting investments to be made with individual Indian funds. There is nothing in the statute that requires payment of a particular rate of interest, much less that makes the United States accountable in damages for any amount by which the revenues earned fall short of a standard of "reasonable management zeal to get for the Indians the best rate." 229 Ct. Cl. 1, 15–16, 664 F. 2d 265, 274 (1981).

[5] It is improbable that Congress intended § 406 to constitute consent to monetary liability for forestry mismanagement on allotted lands, because before 1924, the Government maintained the position that heavily forested lands were not to be allotted. See *United States* v. *Payne*, 264 U. S. 446, 449 (1924); Brief for United States 3, n. 2. And before 1964, § 406 was a rather bare instrument, simply giving an Indian permission to sell his timber with the Secretary's permission. See *ante*, at 219–220. The legislative history of the 1964 amendments to § 406, see *ante*, at 222, also fails to supply the necessary evidence of congressional intent. The House Report states that "[n]o additional expenditure of Federal funds" was expected to be incurred by reason of the enactment of the legislation. H. R. Rep. No. 1292, 88th Cong., 2d Sess., 2 (1964). A letter from the Interior Department to the Congress urging enactment of the legislation explained only that the standards for timber sales on allotted lands "should help allay disputes and avoid misunderstanding." S. Rep. No. 672, 88th Cong., 1st Sess., 3 (1963).

*Mitchell I.* A nonmonetary duty,[6] without more, is insufficient to overcome the "presumption" that Congress has not consented to suit for money damages. See *Eastern Transportation Co.* v. *United States,* 272 U. S. 675, 686 (1927).

This Court has had occasion in recent cases to emphasize that congressional intent is the ultimate standard in determining whether a private right of action should be inferred from a statute that does not, in terms, provide for such an action.[7] Those cases are instructive, for here, too, the "ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law." *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 578 (1979). As we recognized in *Testan,* courts are not free to dispense with "established principles" requiring explicit congressional authorization for maintenance of suits against the United States simply "because it might be thought that they should be responsive to a particular conception of enlightened governmental policy." 424 U. S., at 400. See *Shaw,* 309 U. S., at 502. The Court today adduces no "evidence that Congress

---

[6] Although not dispositive, the monetary character of a statutory right is a strong indication that a statute "in itself . . . can fairly be interpreted as mandating compensation." By contrast, where, as here, the duties imposed by a statute are not essentially monetary in character, but require implementation through conduct by federal officials, the contrary inference arises: that Congress, by its silence as to a damages remedy, created only a substantive right enforceable through injunctive relief. See *Testan, supra,* at 401, n. 5, 403.

[7] See, *e. g., Jackson Transit Authority* v. *Transit Union,* 457 U. S. 15, 20–23 (1982); *Middlesex County Sewerage Authority, supra,* at 13–18; *Texas Industries, supra,* at 639–640; *California* v. *Sierra Club,* 451 U. S. 287, 292–298 (1981); *Northwest Airlines, Inc.* v. *Transport Workers,* 451 U. S. 77, 91–95 (1981); *Universities Research Assn.* v. *Coutu,* 450 U. S. 754, 770–784 (1981); *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 19–24 (1979). Against the background of sovereign immunity, the rationale of these cases should apply here with particular force.

anticipated that there would be a private remedy." *California* v. *Sierra Club*, 451 U. S. 287, 298 (1981).

The Court defends its departure from our precedents on the ground that the statutes and regulations upon which respondents rely need not be "construed in the manner appropriate to waivers of sovereign immunity." *Ante*, at 219. The Court in effect is overruling *Mitchell I sub silentio*, for as its discussion on the Tucker Act makes clear, see *ante*, at 216–219, we there at least "accepted the government's . . . claim that a strict standard of construction, applicable to deciding whether Congress had enacted a waiver of sovereign immunity, should be applied in interpreting substantive legislation for the benefit of Indian people." Hughes, Can the Trustee be Sued for its Breach? The Sad Saga of United States v. Mitchell, 26 S. D. L. Rev. 447, 473 (1981). We expressly held that the General Allotment Act at issue in *Mitchell I* "does not *unambiguously* provide that the United States has undertaken full fiduciary responsibilities." 445 U. S., at 542 (emphasis added). Cf. *Army & Air Force Exchange Service* v. *Sheehan*, 456 U. S., at 739 ("explicitly reject[ing] the argument that 'the violation of any statute or regulation . . . automatically creates a cause of action against the United States for money damages'") (quoting *Testan*, 424 U. S., at 401). The Court hardly can view the statutes here as "unambiguously" imposing trust duties on the Government.

## II

The Court makes little or no pretense that it is following doctrine heretofore established. Without pertinent analysis, it simply concludes: "Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Ante*, at 226. This conclusion rests on

two dubious assumptions. First, the Court decides that the statutes create or recognize fiduciary duties. It then reasons that because a private express trust normally imports a right to recover damages for breach, and because injunctive relief is perceived to be inadequate, Congress necessarily must have authorized recovery of damages for failure to perform the statutory duties properly. The relevancy of the first conclusion is questionable, and the other departs from our precedents, chiefly *Testan* and *Mitchell I*.

The Court simply asserts that the statutes here "clearly establish fiduciary obligations." *Ante*, at 226. See also *ante*, at 225 ("a fiduciary relationship necessarily arises"). I agree with the dissent in the Court of Claims that "there is kind of a bootstrap quality of reasoning in saying that [the United States'] duties expressed by law are those of a trustee, and, therefore, we may look at SCOTT ON TRUSTS or the RESTATEMENT OF TRUSTS and impose on [the Government] all the other consequences the law, as stated by those authorities, derives from the status of an erring nongovernmental trustee." 229 Ct. Cl. 1, 31, 664 F. 2d 265, 283 (1981) (Nichols, J., concurring and dissenting). "The federal power over Indian lands is so different in nature and origin from that of a private trustee . . . that caution is taught in using the mere label of a trust plus a reading of SCOTT ON TRUSTS to impose liability on claims where assent is not unequivocally expressed." *Id.*, at 32, 664 F. 2d, at 283.[8] The trusteeships to

---

[8] "There are a number of widely varying relationships which more or less closely resemble trusts, but which are not trusts, although the term 'trust' is sometimes used loosely to cover such relationships. It is important to differentiate trusts from these other relationships, since many of the rules applicable to trusts are not applicable to them." Restatement (Second) of Trusts § 4, Introductory Note, p. 15 (1959). For example, the Court often has described the fiduciary relationship between the United States and Indians as one between a guardian and a ward. See, *e. g.*, *Klamath Indians* v. *United States*, 296 U. S. 244, 254 (1935); *United States* v. *Kagama*, 118 U. S. 375, 383 (1886). But "[a] guardianship is not a trust." Restatement (Second) of Trusts § 7. There is no explanation, however, why the Court chooses one analogy and not another. The choice appears to be influenced

which the Court has referred in the past have manifested more the view that pervasive control over Indian life is such a high attribute of federal sovereignty that States cannot infringe upon that control. *Ibid.*[9] The Court today turns this shield into a sword.

---

by the fact that "[t]he duties of a trustee are more intensive than the duties of some other fiduciaries." *Id.*, § 2, Comment *b*.

The Court asserts that "[a]ll of the necessary elements of a common-law trust are present"—a trustee, a beneficiary, and a trust corpus. *Ante*, at 225. But two persons and a parcel of real property, without more, do not create a trust. Rather, "[a] trust . . . arises as a result of a manifestation of an intention to create it." Restatement (Second) of Trusts § 2. See *id.*, § 23 ("A trust is created only if the settlor properly manifests an intention to create a trust"); *id.*, § 25 ("No trust is created unless the settlor manifests an intention to impose enforceable duties"). This is the element that is missing in this case, and the Court does not, and cannot, find that Congress has manifested its intent to make the statutory duties upon which respondents rely trust duties. Cf. *id.*, § 95; 2 A. Scott, Law of Trusts § 95, p. 772 (3d ed. 1967) ("At common law it was held that a use . . . could not be enforced against the Crown . . .").

Indeed, given the language of the statute at issue in *Mitchell I*, the case for finding that Congress intended to impose fiduciary obligations on the United States was much stronger there than it is here. See 445 U. S., at 547 (WHITE, J., dissenting). One of the authorities cited by JUSTICE WHITE, 2 Scott, *supra*, § 95, specifically discusses the General Allotment Act as an example of the United States acting as a trustee. Furthermore, a trustee can "reserv[e] powers with respect to the administration of the trust." Restatement (Second) of Trusts § 37. Unless the United States agrees to be held liable in damages, even the existence of a trust does not necessarily establish that the Government has surrendered its immunity from damages.

[9] The Court has invoked the fiduciary relation primarily (i) to preclude unauthorized state interference in the relations between the United States and the Indian tribes or other unauthorized exercise of state jurisdiction on Indian lands, see, *e. g.*, *Kagama, supra*, at 382–384; (ii) to bar or nullify exercises of state court jurisdiction in matters affecting Indian property rights, in which the United States was not properly joined or represented, see, *e. g.*, *Minnesota* v. *United States*, 305 U. S. 382, 386 (1939); *United States* v. *Candelaria*, 271 U. S. 432, 442–444 (1926); (iii) to interpret doubtful or ambiguous treaty language in favor of the Indians, see, *e. g.*, *United States* v. *Shoshone Tribe*, 304 U. S. 111, 117–118 (1938); *Minnesota* v. *Hitchcock*, 185 U. S. 373, 396 (1902); (iv) to determine the liability of the

In my view, it is clear that "[n]othing on the face" of any of the statutes at issue, *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 59 (1978), or in their legislative histories, "fairly [can] be interpreted as mandating compensation" for the conduct alleged by respondents. Some of the statutes involved here, to be sure, create substantive duties that the Secretary must fulfill. But this could equally be said of the Classification Act, considered in *Testan*. It requires that pay classification ratings of federal employees be carried out pursuant to "the principle of equal pay for substantially equal work." 5 U. S. C. § 5101(1)(A). Although the federal employee in *Testan* alleged a violation of the Act, the Court concluded that a backpay remedy was unavailable, rejecting the argument that the substantive right necessarily implies a damages remedy. 424 U. S., at 400–403.

Ignoring this holding in *Testan*, the Court concludes that the mere existence of a trust of some kind *necessarily* establishes that Congress has consented to a recovery of damages. In effect we are told to accept on faith the existence of a damages cause of action: "Given the existence of a trust relationship, it *naturally follows* that the Government should be liable in damages for the breach of its fiduciary duties." *Ante*, at 226 (emphasis added). See also *ibid.* (damages are a "fundamental incident" of a trust relationship); *ante*, at 227 (it would be "anomalous" not to find a damages remedy). The

United States for damages under the Just Compensation Clause where, acting as a fiduciary manager, it has converted the form of Indian property, see, *e. g., United States* v. *Sioux Nation of Indians*, 448 U. S. 371, 415–416 (1980); and (v) to emphasize the high standard of care that the United States is obliged to exercise in carrying out its duties respecting the Indians, see, *e. g., United States* v. *Mason*, 412 U. S. 391, 398 (1973); *Seminole Nation* v. *United States*, 316 U. S. 286, 296–297 (1942). But the Court has never, until today, invoked the doctrine to hold that the United States is answerable in money damages for breaches of the standards applicable to a private fiduciary.

Court can find no more support for this proposition than the dissenting opinion in *Mitchell I*.   See *ibid.*[10]

It is fair to say that the Court is influenced by its view that an injunctive remedy is inadequate to redress the violations alleged—precisely the inference deemed inadmissible in *Testan.*[11]   It is the ordinary result of sovereign immunity that unconsented claims for money damages are barred. The fact that damages cannot be recovered without the sovereign's consent hardly supports the conclusion that consent has been given.   Yet this, in substance, is the Court's reasoning.   If it is saying that a remedy is necessary to redress every injury sustained, the doctrine of sovereign immunity will have been drained of all meaning.   Moreover, "many of the federal statutes . . . that expressly provide money damages as a remedy against the United States in carefully limited circumstances would be rendered superfluous."   *Testan*, 424 U. S., at 404.

---

[10] The Court reaches for support in *Seminole Nation* v. *United States, supra,* and *United States* v. *Creek Nation,* 295 U. S. 103 (1935), but both cases cut against the Court's theory in this case.   The discussion of the Government's fiduciary duty in *Seminole Nation* referred to a claim to compel payments expressly prescribed by Treaty.   See 316 U. S., at 296–297.   *Creek Nation* involved a taking claim.

[11] Also significant is the Court's standardless remand for further proceedings consistent with its opinion.   Where the statute upon which liability is premised creates no right to payment of a sum certain, the Court of Claims (now the United States Claims Court) will be required, without legislative guidance, to determine the extent of liability, if any, and the items of damages that are cognizable.   This task, unlike the factual or legal determination whether a particular individual falls within a class granted a right to payment of money by a statute, is not one to which courts are adapted. Any rules established will be of "judicial cloth, not legislative cloth." *Weinberger* v. *Catholic Action of Hawaii/Peace Education Project,* 454 U. S. 139, 141 (1981).   I assume, however, that the law of trusts generally will control and that all defenses to actions on breaches of trust, such as consent by the beneficiary and laches, will be fully available to the United States. Cf. 229 Ct. Cl., at 15–16, 664 F. 2d, at 274.

## III

The Court has made no effort to demonstrate that Congress intended to render the United States answerable in damages upon claims of the kind presented here. The mere application by a court of the label "trust" cannot properly justify disregard of an immunity from damages the Government has never waived. I would reverse the judgment of the Court of Claims.