Michael C. GAHAGAN, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 265–88 C.

United States Claims Court.

Dec. 20, 1989.

Richard J. Hirn, Washington, D.C., for plaintiffs.

Evelyn M. Korschgen, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart Schiffer, for defendant.

RADER, Judge.

The National Weather Service (NWS) monitors weather nationwide 24 hours a day, 365 days a year. NWS forecasts ordinary changes in weather and warns the public about serious or life-threatening storms. NWS's mission requires around-the-clock work. When NWS employees work night shifts or holidays, they qualify for premium pay.

Plaintiffs work for NWS in Kansas, California, and Washington. Plaintiffs Michael C. Gahagan, James J. Prange, and Russell D. Trowbridge regularly earned premium pay for night shift work. This case arose when plaintiffs requested leave for military or court duty. NWS then rescheduled plaintiffs from their regular premium pay shifts to shifts without premium pay.

Plaintiffs also challenge NWS holiday scheduling practices. Plaintiffs Russell D. Trowbridge and Joseph R. Morrell regularly work shift assignments that include holiday duty. To avoid paying premium rates, NWS later relieved plaintiffs from holiday duty.

Plaintiffs instituted this action seeking recovery of premium pay. Plaintiffs now move for summary judgment. Defendant moves to dismiss the claims of Gahagan, Morrell, and Trowbridge for lack of jurisdiction. Defendant also moves for summary judgment on the entire complaint.

This case was transferred to this judge after completion of briefing but before oral argument. This court held oral argument on November 8, 1989. On the basis of the parties' written and oral presentations, this court grants plaintiffs' motion for summary judgment.

## FACTS

NWS employs meteorologists in over 250 offices throughout the United States to forecast weather conditions and issue storm warnings. To accomplish this vital mission, all NWS offices operate 24 hours a day, 365 days a year.

NWS employees work about 40 hours each week. NWS makes shift assignments to cover night and weekend work. NWS regional supervisors schedule meteorological staff to day shifts (8 a.m.—4 p.m.), evening shifts (4 p.m.—midnight), or "graveyard" shifts (midnight—8 a.m.). NWS employees first receive their shift assignments in planning schedules issued several months in advance.

Hourly wages at NWS vary with shift assignments. For work between 6 p.m. and 6 a.m., employees receive a regular hourly wage plus 10% premium pay, known as a "night differential." For Sunday work, employees receive regular wages plus a 25% premium; for holiday work, regular wages and a 100% premium. To account for holidays falling on an employee's normal day off, NWS provides, instead of an extra day off, a 100% premium for the day that immediately precedes or follows the holiday. The employee thus works a "day in lieu of holiday."

NWS supervisors must revise planning schedules to account for sick leave, job training, or other exigencies. Local supervisors also adjust schedules to create the most cost-efficient allocation of shift assignments. Thus, supervisors revise holiday schedules and shift assignments to avoid paying premium hourly wages. Depending on the particular NWS office, shift assignments become fixed either 48 or 72 hours in advance.

Gahagan is a meteorological technician at NWS's office in Goodland, Kansas. Gahagan is also a full-time student. Therefore, NWS's Goodland office supervisor honors Gahagan's request to work only graveyard shifts (midnight—8 a.m.). Accordingly, on the planning schedules for the summer months of 1986 and 1987, NWS's supervisor scheduled Gahagan for graveyard shifts on Monday through Friday.

Gahagan belongs to a local armed forces reserve unit. To satisfy his reserve duty

requirements, Gahagan informed his supervisor weeks in advance that he could not report to work during the weeks of August 3 and August 10, 1986, and July 19 and July 26, 1987. NWS later changed Gahagan's midnight shifts during these weeks to day shifts. This rescheduling meant that Gahagan earned regular hourly wages instead of premium pay wages during military leave.

Gahagan was covered by the NWS Central Region Collective Bargaining Agreement (CBA) during the time encompassed by his claim. Gahagan did not bring a grievance about his loss of premium pay during military leave within the time limits of Article 10 § 6 of the CBA. Therefore, the terms of the CBA nullified his grievances.[1] Gahagan nonetheless asserts a right to bring a claim in the Claims Court under the Tucker Act.

Prange is a meteorological technician at NWS's office in Auburn, Washington. The Auburn office, including Prange, works a predictable three-week rotational shift. Under this schedule, Prange works approximately one week of midnight shifts, one week of day shifts, and then one week of evening shifts. Other employees work the same three shifts, but in a different order. This schedule ensures that the weather station has a full staff at all times.

NWS scheduled Prange to work an evening shift on Sunday, March 9, 1986, and five midnight shifts from Wednesday, March 12 through Sunday, March 16, 1986. In early 1986, Prange informed NWS that he could not work during the weeks of March 9 and March 16 because of military reserve duty. When NWS prepared the fixed schedules for these weeks, it eliminated Prange's Sunday and midnight shifts and inserted a designation for military leave (ml) in their place. Thus, Prange received regular pay instead of Sunday premium pay and night differential while on military leave.

Trowbridge is a meteorological technician at NWS's office in Spokane, Washington. The Spokane weather center operates on a five-week rotational schedule that requires personnel to work approximately two weeks of day shifts, two weeks of midnight shifts, and one week of evening shifts. Like the Auburn office, NWS's Spokane supervisor rotates these shift assignments to keep the office operational at all hours.

NWS scheduled Trowbridge to work a day shift on Tuesday, February 18, 1986. February 17 was President's Day and Trowbridge's normal day off. Consequently, Trowbridge would receive holiday premium pay if he worked on February 18, his "day in lieu of holiday." Trowbridge informed NWS that he had been summoned to jury duty and could not work during the week of February 17. NWS relieved Trowbridge from duty for Tuesday, February 18, thereby denying him premium pay while on court leave.

In 1988, NWS scheduled Trowbridge for the evening shift on Sunday, February 14, and for the day shift from February 17 through February 20. Monday and Tuesday were Trowbridge's days off. Monday, February 15, was also a federal holiday. Consequently, Trowbridge would receive holiday premium pay for working on Sunday, his day in lieu of holiday. NWS, however, relieved Trowbridge from working on Sunday. Consequently, Trowbridge received regular rather than premium pay for his "day in lieu of holiday."

Morrell works as a meteorologist employed at NWS's San Francisco office. NWS's San Francisco office supervisor originally scheduled Morrell for midnight shifts from Sunday, November 8 through Saturday, November 14, 1987. Wednesday and Thursday were Morrell's regular days off. Wednesday also was a federal holiday. Consequently, Morrell would receive

---

1. Article 10 § 8 of the NWS Central Region Collective Bargaining Agreement states:
   Failure of the grievant to observe the time limit ... shall be cause for nullifying his grievance.

Defendant's Motion to Dismiss, filed Jan. 6, 1989, Appendix (Def.App.), at 47.

holiday premium pay for working on the Tuesday before the federal holiday.

When preparing its fixed schedule, however, NWS changed Morrell's days off from Wednesday and Thursday to Thursday and Friday. NWS then relieved Morrell from duty on the federal holiday. Morrell's supervisor assigned another employee in the office to Morrell's old shifts. This rescheduling and later relief from duty earned Morrell regular pay instead of the premium pay he would have received under the original schedule.

Plaintiffs instituted this action in the United States Claims Court under the Tucker Act. 28 U.S.C. § 1491 (1982). Plaintiffs seek recovery of holiday and night differential premiums lost due to NWS's rescheduling practices. Prange, Gahagan, and Trowbridge claim that NWS may not reduce their pay due to absence for military or court leave. 5 U.S.C. §§ 6322, 6323 (1988). Trowbridge and Morrell contend that NWS improperly denied them holiday premium pay under 5 U.S.C. § 6101 (1988).[2] Plaintiffs move for summary judgment on these claims.

Defendant challenges this court's jurisdiction over plaintiffs' § 6101 claim. In addition, defendant seeks to dismiss Gahagan's claim on the grounds that he only may pursue relief through the grievance procedure in NWS's collective bargaining agreement. Defendant also moves for summary judgment on plaintiffs' entire complaint. Defendant claims that NWS did not violate § 6101 because the agency's 1986 National Scheduling Policy embodies a determination that holiday sensitive scheduling reduces substantial costs.

## DISCUSSION

### *Jurisdiction*

■ The Tucker Act confers important jurisdiction on the United States Claims Court:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act, however, does not create a substantive right to collect money damages from the Government. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Instead, the Act empowers the Claims Court to enforce substantive rights embodied in the Constitution, federal statutes, regulations of executive departments, or contracts. *United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1983); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

Not every claim arising from the Constitution, statutes, or regulatory laws of the United States satisfies the jurisdictional requirements of the Tucker Act. *Mitchell*, 463 U.S. at 216, 103 S.Ct. at 2967. The Court of Claims clarified:

[T]he allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum.

. . . .

Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.

*Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 605, 607, 372 F.2d 1002, 1007, 1009 (1967) (citation omitted); *see also, Bisom v. United States*, 5 Cl.Ct. 454, 456–57 (1984).

---

2. Plaintiffs do not dispute the right of NWS, however, to relieve an employee on his day in lieu of holiday. Instead, plaintiffs only contend that NWS must establish a schedule without consideration of the holiday. If required, plaintiff agrees that NWS may relieve unnecessary employees from work on holidays or on days in lieu of holidays.

Defendant moves to dismiss on two grounds. First, defendant contends that this court lacks jurisdiction to entertain the claims of Morrell and Trowbridge. Defendant contends that 5 U.S.C. §§ 5546(b) (1988) and 6101(a)(3), the provisions invoked by Morrell and Trowbridge, do not provide monetary damages for violations. Second, defendant seeks to dismiss Gahagan's claim for holiday premium pay because his collective bargaining agreement provides an exclusive remedy.

*Money–Mandating Statute*

■ Morrell and Trowbridge invoke 5 U.S.C. § 6101(a)(3) to support their claim:

(3) Except when the head of an Executive agency ... determines that his organization would be seriously handicapped in carrying out its functions or that costs would be substantially increased, he shall provide, with respect to each employee in his organization, that—

. . . .

(E) the occurrence of holidays may not affect the designation of the basic workweek. . . .

5 U.S.C. § 6101(a)(3)(E). Section 6101 provides "holiday blind" scheduling unless an agency determines that such a policy would seriously handicap the agency's mission or impose substantial costs.

Section 6101 can "fairly be interpreted as mandating compensation." *Eastport Steamship*, 372 F.2d at 1009. Indeed the Court of Claims assumed jurisdiction over § 6101 to determine the pay entitlements of Immigration and Naturalization Service (INS) employees. *Acuna v. United States*, 202 Ct.Cl. 206, 479 F.2d 1356 (1973), *cert. denied*, 416 U.S. 905, 94 S.Ct. 1608, 40 L.Ed.2d 109 (1974). In *Acuna*, the Claims Court's predecessor ruled that INS "properly exercised its discretion in excluding Sundays from the basic workweek." 479

F.2d at 1364. For this reason, the *Acuna* plaintiffs had "already received all extra compensation due them. . . ." *Id.* Section 6101 delineates scheduling practices which entitle federal employees to pay. Therefore, violations of § 6101 deprive federal employees of pay. The Court of Claims took jurisdiction to determine the pay consequences and pay remedies available for violation of § 6101.

The Court of Claims' reading of § 6101 finds further support in the Back Pay Act. 5 U.S.C. § 5596 (1988). The Back Pay Act provides a money mandate if violation of a personnel practice causes pecuniary loss. *Hambsch v. United States*, 848 F.2d 1228, 1231 (Fed.Cir.1988). Plaintiffs claim that NWS underpaid them by engaging in inappropriate scheduling practices. This § 6101 claim falls within the language of the Back Pay Act:

An employee of an agency who ... is found ... to have been affected by an unjustified or unwarranted personnel action which has resulted in the ... reduction of all or part of the pay ...

(A) is entitled ... to receive ...

(i) an amount equal to all or any part of the pay. . . .

5 U.S.C. § 5596(b)(1).[3] Therefore, reading § 6101 in conjunction with Court of Claims precedents and § 5596, this court has jurisdiction over plaintiffs' claim that NWS violated Congress's "holiday blind" scheduling mandate.

*Grievance Procedure As Exclusive Remedy*

■ Gahagan's CBA sets forth a comprehensive procedure for resolving employee grievances. According to Article 10 of the CBA, the grievance procedure is the exclusive mechanism for resolving disputes "[u]nless otherwise provided."[4] Article 10

---

**3.** The Back Pay Act does require exhaustion of all available administrative remedies before seeking relief before this court. 5 U.S.C. § 5596(b)(1); *Walker v. United States*, 179 Ct.Cl. 723 (1967), *cert denied*, 389 U.S. 1036, 88 S.Ct. 772, 19 L.Ed.2d 825 (1968). Except for Gahagan, defendant did not contend that plaintiffs failed to exhaust any administrative remedies.

Gahagan, however, can establish jurisdiction under § 6323 and the Tucker Act.

**4.** In pertinent part, § 1 of the grievance procedure states:

The purpose of this article is to provide for a mutually acceptable method for the prompt and equitable settlement of employee, Union and Management grievances over the inter-

lists 15 types of grievances excluded from the procedure. Gahagan's premium pay and military leave scheduling dispute does not fall within any of the CBA's exclusions. Therefore, Gahagan's dispute is a "grievance" subject to the negotiated procedures of the CBA. This court must still decide, however, whether this exclusive grievance procedure forecloses judicial review of Gahagan's claim.

The language of 5 U.S.C. § 7121 (1988) suggests that the grievance procedures of a CBA are exclusive mechanisms:

§ 7121. *Grievance Procedures.*

(a)(1) Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability. Except as provided in subsections (d) [prohibited personnel practices] and (e) [actions based upon unacceptable performance and adverse actions] of this section, the procedures shall be the exclusive procedures for resolving grievances which fall within its coverage.

(2) Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement.

5 U.S.C. § 7121. In two recent cases, the Federal Circuit examined whether § 7121 forecloses judicial review where a grievance procedure purports to be the exclusive mechanism for resolving employment claims. *Carter v. Gibbs,* 883 F.2d 1563 (Fed.Cir.1989); *Harris v. United States,* 841 F.2d 1097 (Fed.Cir.1988).

In *Harris,* a federal employee seeking differential pay for an environmental hazard at work instituted an action under the Tucker Act. The employee's claim required the court to determine whether exposure to asbestos at a particular plant in Georgia was an unusually severe working condition warranting differential pay under 5 U.S.C. § 5343(c) (1982). The United States Court of Appeals for the Federal Circuit held that § 7121 foreclosed judicial

review. The appeals court ruled that the employee's collective bargaining agreement established an "exclusive" procedure for resolving employment claims. In so ruling, however, the Federal Circuit did not hold that the so-called exclusive grievance procedure would foreclose judicial review of any claim brought under the Tucker Act. Rather, the Federal Circuit emphasized that the particular statute establishing additional compensation for environmental hazards demanded local resolution:

It seems apparent that a claim respecting hazardous air at a particular plant is grievable and is a local, fact-specific issue.... An entitlement created by nationwide federal law, as for example to statutory overtime under the Fair Labor Standards Act, 29 U.S.C. § 216(b), would be a different matter as to which we need express and do express no opinion here.

*Harris,* 841 F.2d at 1100. Consequently, a grievance procedure's ability to foreclose judicial review depends on the nature of the underlying statute invoked to establish Tucker Act jurisdiction.

The Federal Circuit's later opinion in *Carter* clarified the reasoning embodied in *Harris.* In *Carter,* a federal employee instituted an action under the Fair Labor Standards Act (FLSA) for overtime pay. In spite of a collective bargaining agreement that contained an exclusive grievance procedure, the Federal Circuit permitted judicial review. The court reasoned that, unlike the statute at issue in *Harris,* FLSA prescribes pay entitlements that are uniformly applicable to all federal employees nationwide.

We see no anomaly in giving federal employees the choice of asserting FLSA claims either through the grievance procedure or in court.... [I]n *Harris,* in holding that grievable claims for environmental differential pay authorized by 5 U.S.C. § 5343 may not be brought under the Tucker Act, this court pointed out that "[a]n entitlement created by nation-

---

pretation or application of this agreement and other employee dissatisfactions over matters subject to the control of Management. Unless

otherwise provided for, this procedure will be the sole procedure available ... for resolving grievances. Def.App., at 44.

wide federal law, as for example overtime pay under the Fair Labor Standards Act ... would be a different matter...."
*Carter*, 883 F.2d at 1569 (citations omitted). Consequently, FLSA claims are particularly suited for judicial review rather than local resolution through a grievance procedure.

Gahagan's claim arises under § 6323 because his military leave caused a reduction in pay. Section 6323 applies uniformly to federal employees nationwide. Consequently, the purportedly "exclusive" grievance procedure contained in the CBA does not preclude judicial review of Gahagan's claim.

Defendant argues, however, that the pay entitlements established by § 6323 apply only to a small class of federal employees. Defendant contends, therefore, that Gahagan's entitlement is more like the grievable environmental hazard pay in *Harris* than the judicially resolved FLSA claim in *Carter*. This argument misses the most critical distinction between *Harris* and Gahagan's claim. Military leave pay entitlements apply uniformly to federal employees nationwide. The environmental hazard pay entitlement in *Harris*, however, was established by reference to local wage standards and applicable only to employees in a particular government plant in Georgia.

*Carter* further clarified that § 7121 only forecloses an employee's opportunity to pursue other administrative remedies, not judicial relief. The Federal Circuit stated:

> Moreover, there are indications in the legislative history of the Reform Act that Congress intended the "exclusive procedures" provision to foreclose access only to alternative administrative procedures for settling disputes, and not to bar judicial remedies expressly provided by other statutes.

*Carter*, 883 F.2d at 1566-67.

Gahagan seeks judicial, rather than administrative, resolution of his pay claim. Thus, because Gahagan seeks judicial enforcement of a nationwide federal law, his collective bargaining agreement does not foreclose review of his claim in the Claims Court.

### *Summary Judgment*

Both parties move for summary judgment under RUSCC 56(b). When no material facts are in dispute, RUSCC 56 authorizes this court to resolve issues as a matter of law. *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144 (Fed.Cir. 1983).

A movant for summary judgment has the burden of demonstrating the absence of a genuine issue as to any material fact. *Auld*, 714 F.2d at 1146. The movant can also discharge its burden by demonstrating that the nonmoving party did not establish an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

When evaluating the merits of summary judgment motions, this court must resolve reasonable factual disputes against the movant. *Auld*, 714 F.2d at 1146. Mere denials and bald assertions, however, do not create an evidentiary conflict. *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir.1984). Furthermore, only disputes over facts that might actually affect the outcome of the case prevent an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Substantive law will identify material disputes of fact. *Id.* at 248, 106 S.Ct. at 2510.

### *Compensation During Court and Military Leave: 5 U.S.C. §§ 6322 and 6323*

Federal employees who must report to court either for jury duty or as a witness receive leave without reduction in pay:

> § 6322. *Leave for jury or witness service; official duty status for certain witness service*
>
> (a) An employee ... is entitled to leave, without loss of, or reduction in, pay ... during a period of absence with respect to which he is summoned, in connection with a judicial proceeding ... to serve—
>
> (1) as a juror; or
>
> (2) other than as provided in subsection (b) of this section, as a witness on

behalf of any party in connection with any judicial proceeding to which the United States ... is a party....

5 U.S.C. § 6322. Congress provided the same guarantee to federal employees who miss work because of active duty or training as a reserve in the armed forces or national guard. 5 U.S.C. § 6323.

In enacting §§ 6322 and 6323, Congress recognized that trial by jury and the nation's defense preparedness are preeminent governmental objectives. Accordingly, Congress prevented federal employees from suffering any financial penalty during court or military leave:

> [W]hen the purpose of the jury/military duty leave provisions is considered, the logic of continuing an employee's regular pay undiminished while on this kind of leave is evident. The employee is in effect permitted to be at a public service duty location, which Congress has determined is not only desirable but should be encouraged by assuring the employee that he will not suffer any pay detriment.

*Lanehart v. Horner,* 818 F.2d 1574, 1582 (Fed.Cir.1987). Thus, Congress created a financial incentive for employees to undertake military reserve and jury service.[5]

■ Congress intended "to preserve the status quo with respect to the employee's compensation when he is on approved leave...." *Lanehart,* 818 F.2d at 1579. Thus, the Federal Circuit has ruled that employees are entitled to "the total compensation or remuneration *normally and regularly received*...." *Id.* at 1581 (emphasis added). Protected compensation includes normally and regularly scheduled overtime. *Id.* at 1583; *see also,* 27 Comp. Gen. 353 (1947).

In drafting §§ 6322 and 6323, Congress carefully selected language to guarantee any form of compensation regularly received by employees who must take leave for jury or military duty. Congress used the generic word "pay" without qualification and instead of the more specific terms contained in other sections of federal pay legislation. For example, in other federal pay statutes, Congress used the term "basic pay" to describe an employee's base salary, "premium pay" to describe compensation for holiday or Sunday work, and "night differential" to describe compensation for evening shifts. 5 U.S.C. §§ 5545, 5546 (1988), *discussed in Lanehart,* 818 F.2d at 1582. Furthermore, in 5 U.S.C. § 4109(a)(1) (1988), Congress explicitly defined compensation as "all or part of the pay (except overtime, holiday, or night differential pay) of an employee...." Thus, in the context of §§ 6322 and 6323, Congress intended to use the word "pay" in "an encompassing way" that "can hardly be stated more broadly." *Lanehart,* 818 F.2d at 1580.

Thus, the language and purpose of §§ 6322 and 6323 guarantee that federal employees receive the full pay they would have normally and regularly received in the absence of military or court leave. This court must examine the evidence to determine what each plaintiff would have received but for military or court duty.

■ Gahagan regularly worked midnight shifts. According to the evidence, NWS regularly scheduled Gahagan to work the midnight shift. After Gahagan reported his military duty, the supervisor changed Gahagan to day shifts. As a result, Gahagan received regular pay instead of night differential for the period while on leave. In the absence of military duty, Gahagan would have received a night differential.

On the Auburn office planning schedule for February through May, NWS scheduled Prange to work midnight shifts as well as two or three Sunday shifts every month. After Prange informed his supervisor of his military duty, NWS reassigned him to weekday shifts. This reassignment cost Prange Sunday premium pay while on military leave. Prange would have received night differential pay but for his military duty period.

---

5. Defendant questioned the effectiveness of § 6323 as a financial incentive likely to sway federal employees to enlist for military reserve

duty. Transcript of Proceedings, filed Dec. 12, 1989, (Tr.) at 94–95.

Trowbridge's regularly scheduled day off fell on President's Day, a federal holiday. NWS initially scheduled Trowbridge to work on Monday, February 17, the day before the holiday. This initial schedule entitled him to holiday premium pay. Trowbridge informed his supervisor, however, that he had to report to jury duty during the week of February 16. Due to his leave, Trowbridge only received regular pay for the Monday that he attended jury duty. Without court leave, he would have received holiday premium pay.

Defendant did not argue that NWS changed plaintiffs' regular and normal work schedule to accommodate some other scheduling exigency. Defendant did not contend, for instance, that sickness among other NWS employees required NWS supervisors to shift plaintiffs to day duty to cover for absences. *See, e.g.*, Transcript of Proceedings, filed Dec. 12, 1989, (Tr.), at 89–90. Rather, defendant maintains that NWS supervisors followed NWS scheduling policies by changing plaintiffs' schedules when they requested jury or military leave.[6]

Doctor Elbert W. Friday, Jr., present Director of NWS, enunciated this policy. He instructs NWS supervisors to designate employees requesting court or military leave as unavailable for duty on the fixed schedule. Defendant's Motion to Dismiss, filed Jan. 6, 1989, Appendix (Def.App.), at 10. Consequently, employees never qualify for premium pay or pay enhancements while on leave. Defendant notes that Gahagan's and Prange's supervisors followed this agency directive. *Id.* at 12, 22. Thus, NWS policy precluded plaintiffs from receiving premium pay they would have received but for jury or military leave.

NWS's scheduling policy also defeats the purpose of §§ 6322 and 6323. Whether NWS changes fixed or planning schedules, the change financially penalizes employees who undertake court or military duty. Sections 6322 and 6323 outlaw financial penalties for federal employees who undertake court or military duties. NWS contravenes the purpose of §§ 6322 and 6323 when it prevents employees requesting these special categories of leave from receiving normally scheduled premium pay.

Thus, NWS's scheduling policy violated the language and purpose of §§ 6322 and 6323. NWS's policy denied plaintiffs pay, specifically pay enhancements, they would have normally and regularly received if jury or military duty had not intervened.

Defendant fears that §§ 6322 and 6323 will create entitlements to pay based on the planning, rather than the fixed, schedule. According to defendant, the planning schedules are mere management tools.

This court does not view §§ 6322 and 6323 as creating entitlements to the planning schedule. Rather §§ 6322 and 6323 create an entitlement to pay normally and regularly received but for military or court leave. The planning schedules are simply evidence showing normal and regular pay schemes.

Moreover, defendant admits that the planning schedules are a vital management tool. Tr. at 91–92. The 1986 National Scheduling Policy explicitly states that supervisors should fix workweeks with as few changes as possible to the planning schedule. Def.App. at 130. Thus, planning schedules are reliable evidence of employees' normally and regularly scheduled workweeks.

To the extent that this court's reliance on the planning schedules as evidence creates an entitlement to compensation based on those documents, that entitlement is quite narrow. NWS may change its planning

---

**6.** NWS's scheduling policy, coupled with defendant's arguments, provides incentives for employees to disclose court or military leave requirements only after supervisors establish the fixed schedule. Both parties agree that a change in the fixed schedule due to military or court leave would violate §§ 6322 and 6323. Thus, a federal employee could ensure entitlement to normal and regular pay by postponing notice of court or military leave until after posting of the fixed schedules. *See, e.g.,* Tr. at 90, 97. Last minute notice of leave requirements would force NWS supervisors to reschedule the office on short notice. Hasty rescheduling would inhibit the National Scheduling Policy's goal of maintaining efficient and effective operations. Thus, defendant's argument may well be self-defeating.

schedules to account for employees' job training, vacations, unforeseen weather conditions, sickness, personal leave, and other exigencies not protected by statute. NWS also may adjust its planning schedules to reflect the actual amount of work that will be required on a particular day. However, §§ 6322 and 6323 prevent NWS from changing shift assignments in a manner which reduces pay solely because an employee requests leave for jury or military duty.

This court need not rely solely on the planning schedules to show what pay plaintiffs would have normally and regularly received. Some NWS supervisors forthrightly state that they changed the schedules to deprive plaintiffs of pay enhancements.

With respect to Gahagan and Prange, NWS admits that its supervisors deviated from a predictable schedule of rotational shifts solely to account for plaintiffs' military leave. Gahagan's supervisor indicated in his December 14, 1988 declaration:

> Mr. Gahagan informed me [of military leave] when he received his orders of the dates of his active duty. This conversation occurred four to six weeks before his military orders were effective.
>
> Shortly thereafter I made a notation on the Planning Schedule that he was unavailable for duty during that period.
>
> . . . .
>
> His period of active military duty precluded me from assigning him to any shift.
>
> . . . .
>
> The fixed schedules ... reflected his unavailable status due to military leave.

Prange's supervisor also stated on December 14, 1988:

> In early 1986, Mr. Prange informed me that he would be unavailable due to reserve duty.... Based on this information, I changed his status on the Planning Schedule to not available due to military leave.

Thus, this court finds that NWS improperly rescheduled Gahagan and Prange to deny them premium pay.

Trowbridge's supervisor claims that he gave plaintiff only regular pay for his day in lieu of holiday in accordance with agency policy. Trowbridge's supervisor maintains that NWS policy instructs supervisors to schedule an employee for work on a day in lieu of holiday only when absolutely necessary. Def.App., at 4. Defendant therefore contends that Trowbridge would not have worked even in the absence of court leave.

This assertion by Trowbridge's supervisor lacks support in official NWS practices. Moreover, Trowbridge presents the planning schedules as evidence of normal and regular shifts. Without proof, this court rejects the assertion that Trowbridge did not regularly and normally work on a day in lieu of holiday. Trowbridge's supervisor provides no other office schedules tending to show that employees are generally relieved from work on days in lieu of holidays. Furthermore, the National Scheduling Policy does not articulate this policy. In the absence of evidence beyond this mere assertion, this court cannot sustain defendant's argument.

In the case at bar, the planning schedules showed that plaintiffs would have normally and regularly received pay enhancements. In addition, the record shows that plaintiffs' supervisors changed schedules solely because of the occurrence of military and court leave. Thus, the unrefuted evidence supports a claim for relief.

### *Holiday Premium Pay Under 5 U.S.C. § 6101*

■ Each Executive agency must establish for its full-time employees a basic workweek of 40 hours. 5 U.S.C. § 6101(a)(2)(A). In establishing the basic workweek, the agency must designate particular hours as well as duty days. 5 C.F.R. § 610.111(a)(1) (1987).

An Executive agency may not consider the occurrence of holidays in scheduling the basic workweek for its employees unless necessary to avoid substantial costs or to fulfill its particular mission. 5 U.S.C. § 6101(a)(3)(E). Section 6101 acknowledges that agencies need some latitude in scheduling to fulfill their mission. *Acuna*

479 F.2d at 1360. Consequently, "the several provisions contained in section 6101(a)(3) ... are subject to the discretion of the agency head." *Id.* (footnote omitted).

To evaluate plaintiffs' claim that NWS improperly considered the occurrence of holidays when scheduling employees, this court must undertake a two-step inquiry. First, were NWS scheduling policies for Morrell and Trowbridge holiday blind? Second, if NWS's scheduling practices were not holiday blind, did NWS nonarbitrarily and reasonably determine to schedule around holidays to avoid substantial costs or to preserve the agency's mission?

*Was NWS's Scheduling Holiday Blind?*

NWS's supervisors admit that they considered holidays when reassigning Morrell and Trowbridge. Trowbridge's supervisor admits in his December 14, 1988 declaration that he purposely avoided scheduling employees for holiday work:

> Monday, February 15, 1988 was a Federal holiday. The original Planning Schedule listed Mr. Trowbridge as being off that day as one of his two regular days off.... Mr. Trowbridge was entitled to an extra day off or "day in lieu of holiday" on Sunday February 14, 1988.
>
> ....
>
> I determined that this could be accomplished by shifting another employee ... to cover.... This permitted Mr. Trowbridge to receive a 3 consecutive day break in that work week.
>
> In my judgment the granting of an extra day off under these circumstances has a beneficial effect on the employee involved and on office morale.

Morrell's supervisor made similar statements in his December 14 declaration:

> I also routinely adjust the tentative schedule around Federal holidays to provide three consecutive days off to the maximum number of employees.

Defendant offered no explanation other than the occurrence of a federal holiday as NWS's reason for rescheduling plaintiffs. Furthermore, NWS replaced plaintiffs with other employees instead of totally eliminating the shifts at issue. Consequently, defendant cannot argue that NWS acted under its 1986 Scheduling Policy, which authorizes supervisors to adjust schedules to reflect the actual amount of required work. Indisputably, NWS considered the occurrence of holidays when rescheduling plaintiffs.

*Did NWS Make A Substantial Cost or Handicap Determination?*

Section 6101 includes an exception which permits NWS to consider holidays when scheduling basic work weeks. To qualify for the exception, the agency must determine that holiday-blind scheduling either would impose substantial costs or would seriously handicap the agency's functions. The Court of Claims reviewed the INS's compliance with this legal requirement. *Acuna,* 479 F.2d at 1356.

The Claims Court's predecessor found that INS had "after carefully considering the mandate of the 1954 amendment ... determined that an exception from normal scheduling was justified, in view of agency functions and the costs involved." *Acuna,* 479 F.2d at 1362. INS did not take this responsibility lightly. Rather INS justified its need for an exception with "an exhaustive discussion of the nature of work performed by immigrant inspectors and the inherent administrative difficulties in scheduling their hours of duty." *Id.* The exception would apply "where operations would suffer or costs would be increased...." *Id.*

Defendant argues that NWS's 1986 National Scheduling Policy incorporates the agency's determination that it must consider the occurrence of holidays to reduce substantial costs. The relevant portions of the 1986 Policy state:

> [I]f some event or circumstance which would affect the most efficient and effective scheduling of the rotating shift workers has occurred or is reasonably anticipated, the scheduler will prepare the workweek schedule of the rotating shift workers so as to accomplish the mission of the NWS in the most efficient and effective manner.

Def.App., at 130. This brief declaration is the only evidence that the head of NWS attempted to determine that the agency fit within the § 6101 exception clause.

This single sentence in the 1986 Policy does not, however, satisfy the terms of § 6101. This brief declaration does not state that NWS's functions will be seriously handicapped by a holiday-blind scheduling policy. This sentence refers to accomplishing NWS's mission efficiently. Improving an agency's efficiency is different from seriously handicapping its functions. A serious handicap would jeopardize an agency's entire mission and demand priority attention throughout the organization. Emphasis on improving efficiency presupposes that the agency is performing its mission. Efficiency programs are designed to improve marginally an agency's use of time and resources. The 1986 Policy does not present sufficient justification of a serious handicap of NWS's functioning.

Similarly, the brief sentence in the 1986 Policy does not show a determination that NWS's costs would be substantially increased. Improving efficiency might marginally affect agency costs, but § 6101 requires the NWS Director to determine the likelihood of "substantially increased" costs.

NWS's Director contends that cost considerations prompted promulgation of the 1986 Policy:

As Deputy Director of NWS in 1986, I was aware of the fiscal and policy considerations that led to ... [the Director's] determination.

....

The budget constraints upon NWS simply do not permit any other option. This scheduling policy has been in place for approximately three years and has resulted in substantial savings to NWS. Def.App., at 9–10.

No contemporary documents, other than the single sentence in the 1986 Policy, show that the Director made a determination about serious handicaps or substantial costs. The Director made no justifications similar to those made by the INS Commissioner in *Acuna.* 479 F.2d at 1362. Al-

though not requiring exhaustive findings, § 6101 does require evidence of a reasoned determination. Defendant does not supply such evidence. Rather, the evidence before this court shows that the Director lacked adequate information to determine the effect of scheduling practices upon the agency's budget or mission.

According to John Quadros, President of NWS employees' organization, NWS does not have a systematic procedure for reviewing "how employees are scheduled as a general rule...." Plaintiffs' Opposition to Defendant's Motion, filed Mar. 7, 1989, (Pl. Opp.), App.C, at 3. NWS's Director, according to Mr. Quadros, does not review the schedules prepared by regional offices. NWS headquarters also does not receive time and attendance reports from the various regional offices.

Lois Gajdays, NWS's Director of Management and Budget, similarly testified at a deposition that NWS management does not receive data regarding premium pay outlays. According to Gajdays, neither she nor NWS's Director knows what percentage of personnel costs constitutes outlays for premium pay. Furthermore, though the agency receives payroll summaries from the Treasury Department, Gajdays does not remember seeing any breakdown showing the cost incurred for maintaining holiday shifts. The payroll summaries do not analyze the impact of particular scheduling practices on payroll costs. *See* Pl.Opp., at App.B.

Thus, the record before this court indicates both that NWS documented no determination to satisfy the exception in § 6101 and that NWS's Director lacked information to make such a determination. In the face of the record, defendant presents Ms. Gajdays' declaration that an official familiar with NWS operations can "intuitively" tell whether scheduling policies reduce costs:

Knowing the operation of the Weather Service, understanding how many shifts would be required if you had a rotational basis, if that was subject to change, the cost of adding an additional person to cover those shifts. It is just under-

standing the Weather Service and its operations.

Pl.Opp., App. B, at 21.

To satisfy § 6101's demand for a determination that a particular scheduling practice would save substantial cost, however, NWS must present more than intuition. Dr. Friday states that fiscal considerations motivated the policy, but does not indicate that holiday-sensitive scheduling was part of the policy's cost-cutting program. Defendant does not supply an affidavit or declaration of former director Hallgren, who actually wrote the 1986 policy to reveal that holiday-sensitive scheduling was part of the National Policy. In fact, at oral argument, defendant could not state for the court whether NWS addressed holiday scheduling at all when developing the 1986 National Policy.[7]

In sum, defendant does not show that NWS satisfied the legal requirements to qualify for the § 6101 exception clause. Therefore, this court must grant plaintiff's motion for summary judgment.

## CONCLUSION

NWS may not reduce an employee's regularly scheduled pay solely due to leave for court and military duty. Plaintiffs Gahagan, Prange, and Trowbridge requested military and court leave. NWS supervisors deviated from a regularly scheduled pattern of shifts by changing plaintiffs' assignments. Defendant concedes that NWS's supervisors subsequently rescheduled plaintiffs solely because of the military and jury duty. In the absence of a genuine dispute as to any material fact, this court finds that NWS violated 5 U.S.C. §§ 6322 and 6323 when it rescheduled Gahagan, Prange, and Trowbridge.

NWS may not reschedule its employees solely because of the occurrence of holidays unless the agency issues a determination that holiday-sensitive scheduling is necessary to reduce substantial costs or to preserve the agency's mission. NWS supervisors changed the schedules of Morrell and Trowbridge solely because of the occurrence of holidays. Defendant concedes that plaintiffs' supervisors considered the occurrence of holidays. Furthermore, NWS has yet to determine that holiday-sensitive scheduling was necessary. In the absence of genuine disputes of material fact, this court finds that NWS violated 5 U.S.C. § 6101 when it rescheduled Morrell and Trowbridge.

This court grants plaintiffs' motion for summary judgment and denys defendant's motions for partial dismissal and summary judgment. The parties shall submit a judgment amount to this court on or before January 20, 1990, at which time the Clerk is directed to enter judgment without further order.

No costs.

---

7.    THE COURT: Was holiday scheduling a component of this [NWS's] determination?
    [Defendant's counsel]: I cannot state for the Court whether or not holiday scheduling, specifically, was addressed in 1986, when the National Weather Service policy was implemented, Your Honor.

THE COURT: Does Dr. Friday say that it was a component of the determination?
    [Defendant's counsel]: Within his affidavit he does not, specifically, address the issue of holiday in his affidavit, no, Your Honor, he does not.
Tr., at 69–70.