# Fiduciary Obligations Regarding Bureau of Prisons Commissary Fund

31 U.S.C. § 1321 and its accompanying Department of Justice regulations do not impose a fiduciary obligation on the Bureau of Prisons to expend Commissary Fund moneys only in accordance with the terms of the Commissary Fund trust.

May 22, 1995

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

You have asked whether the Office of Legal Counsel continues to adhere to the analysis of the "Commissary fund, Federal prisons" ("Commissary Fund") contained in the Memorandum for Norman Carlson, Director, Bureau of Prisons, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Disposition of Income From Prison Vending Machines Under the Randolph-Sheppard Act* (Mar. 25, 1986) ("Randolph-Sheppard Memorandum"). *See* Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Frank W. Hunger, Assistant Attorney General, Civil Division, *Re: Revision of Previous Request for Informal Legal Opinion Concerning the Limitations on Expenditures from the Bureau of Prisons Commissary Fund* at 2 (Apr. 13, 1995).

The Randolph-Sheppard Memorandum states that because the Commissary Fund is classified as a "trust" account under 31 U.S.C. § 1321(a)(22), the Bureau of Prisons ("BOP") has the power to expend funds in the account only in a fiduciary capacity. Randolph-Sheppard Memorandum at 4. Applying general principles of trust law, it concludes that income from prison vending machines which would otherwise accrue to the Commissary Fund is not subject to the income-sharing provisions of section 7 of the Randolph-Sheppard Act. *See* Randolph-Sheppard Act Amendments of 1974, Pub. L. No. 93–516, sec. 206, § 7, 88 Stat. 1622, 1627 (codified as amended at 20 U.S.C. § 107d–3).

Because the Randolph-Sheppard Memorandum mischaracterizes the Commissary Fund as a common law trust and suggests that, as trustee, the BOP has a fiduciary obligation to federal prison inmates to expend Commissary Fund income in accordance with the terms of the trust, *see* Randolph-Sheppard Memorandum at 4, 10, we disavow those aspects of the opinion which analyze the Commissary Fund under general trust law principles. Instead, for the reasons stated below, we conclude that 31 U.S.C. § 1321 and its accompanying Department of Justice ("DOJ") regulations do not impose a fiduciary obligation on the BOP to expend Commissary Fund moneys only in accordance with the terms of the Commissary Fund.

Although we recognize that the trust fund analysis contained in our Randolph-Sheppard Memorandum was based to some degree on our interpretation of a memorandum attachment to a Letter for Honorable Elmer B. Staats, Comptroller General of the United States, General Accounting Office, From Frank M. Wozencraft, Assistant Attorney General, Office of Legal Counsel, *Re: Set-Offs Against Prisoners' Trust Funds* (Aug. 23, 1968) ("Prisoners' Trust Fund Memorandum"), we nonetheless reaffirm the analysis presented in the Prisoners' Trust Fund Memorandum. However, we limit the memorandum's applicability solely to those "trust funds" established under 31 U.S.C. § 1321 that *do* impose fiduciary obligations on the United States.

This memorandum does not question the Randolph-Sheppard Memorandum's conclusion that the income-sharing provisions of section 7 of the Randolph-Sheppard Act do not apply to income from prison vending machines which would otherwise accrue to the Commissary Fund, only the reasoning by which the conclusion was reached.

## I. BACKGROUND

DOJ established the prison commissary system in 1930 to sell to prison inmates articles not regularly provided by federal prisons, such as toothpaste, soap, stamps, arts and crafts, newspapers and magazines. Department of Justice Circular No. 2126, ¶¶9–11 (Aug. 1, 1930). At the same time, it established the Commissary Fund in order to finance the purchase of the articles to be sold in the commissaries, pay the salaries of commissary employees, and retain certain commissary system profits in a capital fund for the future operation of the commissaries. *Id.* ¶¶9, 14, 15, 18.

In 1930, DOJ also established an Inmate Trust Fund at each federal prison, wherein inmates were permitted to deposit money brought into the prison upon arrival, money sent to them while in prison and money earned while incarcerated. *Id.* ¶¶2–4. The Inmate Trust Fund was intended to operate in conjunction with the commissary. When purchasing articles from the commissaries, inmates were required to have their Inmate Trust Fund accounts debited in the amount of such articles.

In addition, DOJ created a "Welfare Fund" in 1930, wherein "a portion of the [commissary] profits" could, upon "written order of the Warden" and with the "approval of the Director, Bureau of Prisons," be credited and disbursed "for any purpose accruing to the benefit of the inmate body, as a whole, such as amusements, education, library, or general welfare work." *Id.* ¶¶17–19.

DOJ adopted rules pertaining to the management, use and operation of these activities and functions in the Circular establishing them. These rules afforded the BOP wide-ranging authority to promote its peneological and administrative interests. *See, e.g., id.* ¶23 ("The Warden or Superintendent of an institution may

deny or limit any inmate as to the privilege of purchasing from the 'Institutional Commissary.'''); *id.* ¶10 ("Only those articles which from time to time shall be authorized by the Director, Bureau of Prisons, may be procured through the 'Institutional Commissary' for the use of inmates."); *id.* ¶11 ("An approved list of newspapers, books and magazines, for distribution through the 'Institutional Commissary,' shall be issued from time to time by the Warden or Superintendent of the institution."). The rules also stressed that "[n]o inmate shall be entitled to . . . earnings derived through operation of the 'Institutional Commissary.'" *Id.* ¶21.

New rules, promulgated in 1932, regarding the Commissary Fund and related accounts and functions, *see* Department of Justice Circular No. 2244 (Jan. 1, 1932) ("Circular No. 2244"), continued to vest the BOP with wide-ranging authority. The operating expenses and employee salaries associated with the commissaries continued to be financed through the Commissary Fund. *Id.* ¶¶19, 34. The BOP retained authority to determine the articles sold in the commissaries, *id.* ¶23, the reading materials available for distribution through the commissaries, *id.* ¶25, and the inmates permitted to exercise commissary privileges. *Id.* ¶21. Moreover, the BOP retained the authority to determine whether and how much of the profits from commissary operations would be distributed to the Welfare Fund to be disbursed for the benefit of the inmate population as a whole. *Id.* ¶¶16, 41.

The amended rules continued to deny inmates any entitlement to commissary earnings. *Id.* ¶22. In addition, the separate account for inmates' personal funds was also retained, although it was renamed the "Prisoners' Trust Fund." *Id.* ¶¶1, 2, 5. Further, the amended rules provided for the deposit of the Commissary Fund and Prisoners' Trust Fund in the United States Treasury. *Id.* ¶12.[1]

Congress first recognized the existence of the Commissary Fund in its fiscal year 1933 Department of Justice appropriation. In response to a request from Attorney General William D. Mitchell, Congress authorized DOJ to retain and use proceeds from the operation of the commissaries to pay commissary employees' salaries. *See* Act of July 1, 1932, ch. 361, 47 Stat. 475, 493.[2]

---

[1] Although the BOP occasionally updates its interpretation of Circular No. 2244, the purpose of the Prisoners' Trust Fund and Commissary Fund "remains essentially the same as when created: . . . To maintain inmates' monies . . . while they are incarcerated" and "[t]o provide inmates the privilege of obtaining merchandise not provided by the [BOP] or of a different quality." Federal Bureau of Prisons, U.S. Department of Justice, Trust Fund Management Manual, Program Statement 4500.3, ch. 4501 (1989).

[2] In requesting such authority, Attorney General Mitchell explained that the new commissary system, and the authority to pay the salaries of commissary employees through it, "reduces the possibilities for contraband, assists in the control of the purchase of extra articles by prisoners, and . . . will save the Government a substantial sum of money." Letter for Hon. William B. Oliver, Chairman, Subcommittee on Appropriations, from William D. Mitchell, Attorney General at 1 (Jan. 27, 1932), *reprinted in Department of Justice Appropriation Bill for 1933: Hearing before the Subcomm. on the Departments of State, Justice, Commerce, and Labor Appropriation of the House Comm. on Appropriations*, 72d Cong. 484 (1932) ("1932 Hearings"). Similarly, referring to the personal funds of inmates located in their individual trust accounts, a BOP statement accompanying the Attorney General's statement declared that "[t]he establishment of so-called commissaries is not solely for the purpose of supplying prisoners with special articles not furnished by the Government. It is rather an incident to the adoption of measures for perfecting the control and management of money owned by prisoners but in the custody of prison officials."

Continued

In 1934, as part of the Permanent Appropriation Repeal Act, Congress classified the Commissary Fund and the Prisoners' Trust Fund as "trust funds" and provided that "[a]ll moneys accruing to these funds are hereby appropriated, and shall be disbursed in compliance with the terms of the trust." *See* Permanent Appropriation Repeal Act, ch. 756, §20(a), 48 Stat. 1224, 1233 (1934) (originally codified at 31 U.S.C. §725s(a) (1934)). The statutory language pertaining to the Commissary Fund and Prisoners' Trust Fund has remained essentially unchanged since 1934. Today the funds are listed as "trust funds" at 31 U.S.C. §1321(a)(22) and (a)(21).[3] Pursuant to 31 U.S.C. §1321(b)(1), moneys "received by the United States Government as trustee shall be deposited in an appropriate trust fund account in the Treasury. . . . [A]mounts accruing to these funds. . . are appropriated to be disbursed in compliance with the terms of the trust."[4]

## II. LEGAL ANALYSIS

At common law, "[a] trust . . . is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property *for the benefit of another person, which arises as a result of a manifestation of an intention to create it.*" Restatement (Second) of Trusts §2 (1959) (emphasis added).[5] "No trust is created unless the settlor manifests an intention to impose enforceable duties." *Id.* §25. Moreover, as sovereign, the United States has the capacity to act as a common law trustee. *See* 2 Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* §95 (4th ed. 1987).

Supreme Court precedent informs our decision to recede from our previous observation that 31 U.S.C. §1321 creates a fiduciary relationship between the United States, as trustee, and inmates with respect to the management and operation of the Commissary Fund. While we are not aware of any court decisions discussing whether 31 U.S.C. §1321, or a predecessor provision in the United

---

1932 Hearings at 484–85. The statement provided further that "[c]ommissaries were . . . established as a means to insure the safe and economical procurement and distribution of special articles which by custom prisoners have always been permitted to procure through payment from their personal funds." *Id.* at 485. In addition, the statement argued that the commissary system "[m]inimizes [the] possibility of introduction of contrabands such as dope, liquor, weapons, etc." *Id.*

[3] The Commissary Fund is listed as "Commissary funds, Federal prisons." The Prisoners' Trust Fund is listed as "Funds of Federal Prisoners."

[4] In 1952, Congress authorized the Attorney General to make small loans from the Commissary Fund to deserving inmates upon their release from prison and accept gifts or bequests of money for credit to the Commissary Fund. *See* Act of May 15, 1952, ch. 289, 66 Stat. 72 (originally codified at 18 U.S.C. §4284 (1956)). However, the provision giving the Attorney General the authority to make small loans to released inmates was repealed prospectively in 1984. *See* Comprehensive Crime Control Act of 1984, Pub. L. No. 98–473, §218(a)(3), 98 Stat. 1976, 2027 (1984). The repeal was effective November 1, 1986.

[5] "A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation. . . . Fiduciary relations include not only the relation of trustee and beneficiary, but also, among others, those of guardian and ward, agent and principal, attorney and client. . . . The scope of the transactions affected by the relation and the extent of the duties imposed are not identical in all fiduciary relations. The duties of a trustee are more intensive than the duties of some other fiduciaries." *Id.* §2 cmt. b.

States Code, imposes fiduciary obligations on the United States with respect to "trust funds," it must be noted that 31 U.S.C. § 1321 currently classifies as "trust funds" ninety-one different funds located in the United States Treasury. These funds range from moneys that are identifiable to particular persons (e.g., "Money and effects of deceased patients," Public Health Service, 31 U.S.C. § 1321(a)(30)) to moneys simply dedicated to a particular public purpose (e.g., "Library of Congress trust fund, investment account," 31 U.S.C. § 1321(a)(9); "Violent Crime Reduction Trust Fund," 31 U.S.C. § 1321(a)(91)). The wide-ranging diversity of the Treasury "trust funds" and the lack of identifiable beneficiaries of a number of them suggests that, in enacting the statute, Congress did not intend for the United States to be held to the same duties and obligations as a private, common law trustee with respect to all such Treasury accounts.

In the absence of federal court decisions interpreting 31 U.S.C. § 1321, we must look to interpretations of other statutes to glean the factors which distinguish statutory trusts that impose fiduciary obligations on the United States from those that do not. Several sovereign immunity decisions provide guidance. In *United States v. Mitchell*, 445 U.S. 535 (1980) (*"Mitchell I"*), Quinault Indian allottees of land held "in trust" by the United States sought damages against the United States under the Tucker Act, 28 U.S.C. § 1491, and the Indian Claims Compensation Act, 28 U.S.C. § 1505, for breach of trust and mismanagement of timber resources found on the land. The threshold question resolved by the Supreme Court in *Mitchell I* was whether the General Allotment Act of 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331–358), creates a fiduciary obligation on the part of the United States to manage the timber resources properly, the violation of which could subject the United States to suit.[6] After noting that "[a] waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed,' " *Mitchell I*, 445 U.S. at 538 (quoting *United States v. King*, 395 U.S. 1, 4 (1969)), the Supreme Court concluded that the trust language of the General Allotment Act does not impose any fiduciary management duties on the United States or render it answerable for breach thereof, but merely prevents alienation of the allotted lands and immunizes them from taxation. *Id.* at 544.

Although the General Allotment Act expressly required the United States to "hold the land . . . in trust for the sole use and benefit" of the allottee, *Mitchell I*, 445 U.S. at 541 (quoting the General Allotment Act § 5, 24 Stat. at 389 (codified

---

[6] Section 5 of the General Allotment Act stated:

Upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made . . . and that at the expiration of said period the United States will convey the same by patent to said Indian . . . in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided,* That the President of the United States may in any case in his discretion extend the period.

*Mitchell I,* 445 U S at 541 (quoting the General Allotment Act § 5, 24 Stat. at 389 (codified as amended at 25 U.S.C. § 348)). Congress extended the period during which the United States was to hold the allotted land indefinitely in the Indian Reorganization Act of 1934, ch. 576, § 2, 48 Stat. 984, 984 (codified as amended at 25 U.S.C. § 462).

as amended at 25 U.S.C. § 348)), the Supreme Court, referring to the language and legislative history of the statute as a whole, concluded that "the Act created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." *Id.* at 542. As the basis for its conclusion, the Supreme Court noted that the General Allotment Act "does not unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands." *Id.* The Supreme Court also opined that Congress included the "in trust" language in the statute "not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from state taxation." *Id.* at 544. Finally, the Supreme Court declared that "events surrounding and following the passage of the General Allotment Act indicate that the Act should not be read as authorizing, much less requiring, the Government to manage timber resources *for the benefit of Indian allottees.*" *Id.* at 545 (emphasis added).

In *United States v. Mitchell,* 463 U.S. 206 (1983) (*"Mitchell II"*), the Supreme Court once again considered whether the United States had assumed fiduciary obligations, as trustee, to Quinault Indians as to the management of timber on their allotted lands. In *Mitchell II,* it held that the Tucker Act waives sovereign immunity for claims of breach of fiduciary duty where specific statutes or regulations give rise to the fiduciary duty in question. *Id.* at 218. The Supreme Court reviewed several congressional statutes and government regulations affecting the management of Indian lands. "In contrast to the bare trust created by the General Allotment Act," which was found in Mitchell I not to have imposed fiduciary obligations upon the United States, it held that the statutes and regulations before it "clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians." *Id.* at 224. Accordingly, the Supreme Court concluded that the statutes and regulations "establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Id.*

In support of its holding, the Supreme Court stressed Congress's and the Department of Interior's long-standing involvement in the management of Indian timber lands. It declared that Congress, as demonstrated by its successive legislative efforts to improve the management of Indian timber lands, desired to ensure that such lands were as productive as possible for Indians. *See id.* at 219–223. The Supreme Court also stated that "[t]he language of [the] statutory and regulatory provisions directly supports the existence of a fiduciary relationship," noting that one of the examined acts "expressly mandates that sales of timber from Indian trust lands be based upon the [Interior] Secretary's consideration of the 'needs and best interests of the Indian owner and his heirs' and that proceeds from such sales be paid to owners 'or disposed of for their benefit.' " *Id.* at 224 (quoting

25 U.S.C. § 406(a)). The Supreme Court provided further that "even in its earliest regulations, the Government recognized its duties in 'managing the Indian forests so as *to obtain the greatest revenue for the Indians* consistent with a proper protection and improvement of the forests.' " *Id.* (emphasis added) (quoting U.S. Office of Indian Affairs, Regulations and Instructions for Officers in Charge of Forests on Indian Reservations 4 (1911)).[7]

Lower courts applying *Mitchell I* and *Mitchell II* have refrained from recognizing the existence of fiduciary obligations on the part of the United States where congressional statutes and governmental regulations, by their own terms, do not expressly subject the United States to suit for breach of fiduciary duties, unambiguously provide that the United States has assumed fiduciary duties, or commit the United States to acting in a comprehensive fashion in the best interest or on behalf of trust beneficiaries. *See, e.g., Han v. United States Dep't of Justice*, 45 F.3d 333, 337 (9th Cir. 1995) (refusing to require the United States to file a breach of trust action against the state of Hawaii under section 5(f) of the Hawaii Admission Act, Pub. L. No. 86–3, 73 Stat. 4, 6 (1959), on account of the fact that the Hawaii Admission Act " 'does not unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of' " lands that had been allotted by the United States for agricultural and homestead use) (quoting *Mitchell I*, 445 U.S. at 542); *National Ass'n of Counties v. Baker*, 842 F.2d 369, 375–76 (D.C. Cir. 1988), *cert. denied*, 488 U.S. 1005 (1989) (citation omitted) (concluding that the Revenue Sharing Act, Pub. L. No. 97–258, 96 Stat. 877, 1010 (1982), though establishing a trust fund and naming the Treasury Secretary as trustee of the trust fund, created only a limited trust relationship similar to the relationship found in *Mitchell I*: "*In Mitchell I*[,] the Supreme Court concluded that the General Allotment Act does not confer a right to recover damages against the United States. In *Mitchell II*, the Supreme Court discussed Mitchell I and placed great significance on the fact that the 'trust language of the Act does not impose any fiduciary management duties or render the United States answerable for breach thereof'. . . . We do not think that when Congress created [the State and Local Government Fiscal Assistance] Trust Fund and made the Secretary trustee, Congress did so with the intent that the trustee would be subject to money damages for breach of fiduciary duties. Rather, Congress created the Trust Fund in order to ensure constant funding for the Revenue Sharing Programs. Indeed, there is no indication in the Revenue Sharing Act or its legislative history that the Secretary owes any common law fiduciary obligations to Trust Fund recipients."); *Hohri*, 782 F.2d at 244 (distinguishing non-statutory commit-

---

[7] The Supreme Court also stated that "a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians." *Id.* at 225. However, like the District of Columbia Circuit, "[w]e do not read this alternative holding . . . as articulating a broad rule in favor of finding fiduciary relationships by implication whenever the government assumes pervasive control over a group's property. Read in context, the Court created only a narrow exception—for Indian tribes—to the requirement that the government must expressly state its intent to manage the would-be beneficiaries' property as a trustee." *Hohri v. United States*, 782 F.2d 227, 244 n.39 (D.C. Cir.), *vacated and remanded on other grounds*, 482 U.S. 64 (1987).

ments by the United States to act for the benefit of Japanese-American evacuees during World War II from a "comprehensive obligation to provide for the 'best interests' of the evacuees"); *see also Short v. United States*, 719 F.2d 1133, 1134–36 (Fed. Cir. 1983) (affirming the jurisdiction of the Court of Claims and the Claims Court over an action for breach of fiduciary duties against the United States by Indians where the Indian lands at issue were, like the lands in *Mitchell II*, subject to the comprehensive control of the Government for the benefit of Indians), *cert. denied*, 467 U.S. 1256 (1984).

Applying the standards forged in *Mitchell I*, *Mitchell II* and their progeny, we conclude that 31 U.S.C. § 1321 does not impose fiduciary obligations on the BOP to expend Commissary Fund moneys only in accordance with the terms of the trust. As stated above, 31 U.S.C. § 1321 and its predecessor statutes provide that the Commissary Fund is a "trust fund." However, under the cases discussed above, the mere inclusion of the term "trust" in a federal statute is insufficient to impose fiduciary obligations on the United States as trustee. *See Mitchell I*, 445 U.S. at 540–46. The statute also refers to the United States as "trustee" of the "trust funds." Similarly, under the cited precedent, identification of the United States as trustee in a statute, without more, is insufficient to impose common law fiduciary duties. *See* National Ass'n of Counties, 842 F.2d at 375–76.

The legislative history of 31 U.S.C. § 1321 does not support a conclusion that Congress intended to impose fiduciary obligations on the United States with respect to the Commissary Fund. As noted above, the language of 31 U.S.C. § 1321 originated in section 20(a) of the Permanent Appropriation Repeal Act. The general purpose of that act was to give Congress greater control over the appropriations process by abolishing many permanent appropriations.[8] However, section 20(a) carved out an exception from the general purpose of the act for certain funds located in the Treasury (i.e., "trust funds") that, in Congress's view, did not belong to the United States.

Congress enacted section 20(a) to prevent the Comptroller General from exercising unfettered control over the withdrawal of "trust fund" moneys from the Treasury. By permanently appropriating moneys accruing to Treasury "trust funds," Congress ensured that the Comptroller General would no longer be able to exercise such control. According to the House of Representatives committee report accompanying the act:

---

[8] According to the House of Representatives committee report accompanying the act:

[P]ermanent appropriations are a vicious usurpation and invasion of the rights of sitting Congresses . . . . [T]hey complicate bookkeeping in the Office of the Treasurer . . . make auditing in the Comptroller General's Office difficult; conceal from Congress many avenues of receipts and expenditures (which in itself is an invitation to extravagance) and, for lack of proper annual disclosure, make the work of the appropriations subcommittees conjectural and uncertain.

H.R. Rep. No. 73–1414, at 2 (1934).

> The committee is unanimous in its approbation of the course being followed by the Comptroller General in requiring that moneys, held and administered by Government officers, be deposited into the Treasury, where proper account and audit may be made of all disbursements, but it cannot follow any line of reasoning that will allow the Comptroller General, without specific authority, to permit the withdrawal of moneys so deposited in the Treasury without the express appropriation thereof by Congress. The constitutional provision touching on this matter is unambiguous and direct. Once moneys are covered into the Treasury, regardless of the nomenclature that may be applied to the account in which they are deposited, they are bound by the constitutional inhibition that "No money shall be drawn from the Treasury but in consequence of appropriations made by law."

H.R. Rep. No. 73–1414, at 12.

Congress understood that retaining some permanent appropriations was inconsistent with the overriding purpose of the Permanent Appropriation Repeal Act. It justified this deviation, however, by distinguishing "trust funds" from funds that belong to the United States:

> In order to close the question as to the right of the Comptroller General to approve withdrawals of trust-fund moneys without actual appropriation· thereof by Congress, language has been inserted in this section appropriating the moneys ·in the trust funds listed in this section as well as in trust funds of similar character established in the future. While this is in fact a permanent appropriation in itself, it appears to be the most effective way of meeting the problem, and is entirely justifiable on the ground that the moneys are not *Government* moneys, and in no way enter into the fiscal program of the Government, and follows the policy heretofore employed as to all trust funds.

*Id.* [9]

Like the legislative history of the General Allotment Act discussed in *Mitchell I* and the legislative history of the Revenue. Sharing Act discussed ·in *National·*

---

[9] That Congress considered "trust fund" moneys different from moneys accruing to the United States in its capacity as sovereign is borne out by a discussion of receipt classification in the same committee report.

As a primary thesis, there are, essentially, but two forms of government receipts, (1) those accruing· to the Government, in its sovereign capacity, as a result of [the] law, and (2) those accruing to the Government as a trustee of moneys belonging to individuals, either in consequence of law or as a result of the factual relationship existing between the Government and such individuals. Thus, in the instance of the former, the moneys belong to the Government; in the case of the latter, they belong to the individual.

*Id.* at 3.

*Ass'n of Counties*, section 20(a)'s legislative history reveals that it was enacted for a purpose other than imposing fiduciary obligations on the United States. The fact that Congress distinguished between Treasury "trust funds" and funds truly belonging to the United States in the section's legislative history does not demonstrate Congress's unambiguous desire to subject the United States to suit for breach of fiduciary obligations.[10] Accordingly, the legislative history of 31 U.S.C. § 1321 does not support the position that the statute imposes fiduciary obligations on the BOP with respect to the funds it classifies as "trust funds."[11]

Finally, the terms of the Commissary Fund, as set forth by DOJ in Circular No. 2244, also do not support the imposition of fiduciary obligations. Far from imposing fiduciary duties on the BOP, the provisions of Circular No. 2244 which establish and set forth the operating rules pertaining to the Commissary Fund merely create a mechanism through which inmates may secure items not generally available through the prisons. *See, e.g.,* Circular No. 2244, ¶ 19 ("For the procurement of articles not regularly issued as a part of the institutional administration there is hereby authorized the establishment of an 'Institutional Commissary' through which all articles shall be procured and charged to the fund entitled 'Commissary Fund, Federal Prisons, Trust Fund.'"). Nowhere in Circular No. 2244 is it suggested that the BOP is subject to suit for breach of fiduciary duties. Like-

---

[10] Congress has enacted laws pertaining to the Commissary Fund twice since enactment of the Permanent Appropriation Repeal Act. As stated in note 4, *supra*, in 1952 it authorized the Attorney General to make small loans to released inmates from the Commissary Fund and accept gifts or bequests of money on behalf of the Commissary Fund. In 1984, it repealed the Attorney General's authority to make small loans from the Commissary Fund. When Congress enacted legislation relating to the Commissary Fund in 1952, the committee report accompanying the legislation in the House of Representatives stated:

. [The Commissary Fund] obtains its revenue through the sale of tobacco, candy, handkerchiefs, inexpensive watches, and other small items, at a small margin of profit, from the inmates of the various Federal institutions. Ordinarily these profits are used for purposes which benefit the inmate body as a whole, such as amusements, libraries, and general welfare.

H.R. Rep. No. 82-1662, at 2 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1424, 1424–25. The report's description of the Commissary Fund is consistent with the language of Circular No. 2244, and demonstrates that Congress has never altered the original relationship established between the BOP and inmates with respect to the Commissary Fund.

[11] While the statutory language and legislative history of 31 U.S.C. § 1321 do not unambiguously demonstrate that Congress intended the United States to assume fiduciary obligations as to the management and operation of the "trust funds," they do suggest that Congress intended that moneys accruing to these "trust funds" be permanently appropriated, and therefore, generally subject to laws pertaining to congressional appropriations. *See Soboleski v. Commissioner*, 88 T.C. 1024, 1034 (1987) ("With limited exceptions not here applicable, all amounts credited to all of the U.S. Treasury trust funds . . . are appropriated funds."), *aff'd*, 842 F.2d 1292 (4th Cir. 1988). In fact, the Comptroller General has reasoned that amounts located within Treasury "trust funds" are appropriated funds and, therefore, subject to its jurisdiction. *See* 58 Comp. Gen. 81, 86–87 (1978) (concluding that the General Accounting Office has the authority to review the propriety of contract awards made under the Department of Defense's Foreign Military Sales Program, in part, because funds in the Foreign Military Sales Trust Fund, a "trust fund" established under a predecessor provision to 31 U.S.C. § 1321, were appropriated funds); *see also* Letter for Sidney R. Yates, Chairman, Subcommittee on the Department of the Interior and Related Agencies, House Committee on Appropriations, from Milton J. Socolar, Comptroller General of the United States, General Accounting Office, 1985 WL 53671, at 2 (Dec. 12, 1985) ("Like a number of other Federal entities, the [United States Holocaust Memorial] Council expends both appropriated funds and donated funds to accomplish its purposes. As a general rule, expenditures from both sources would be regarded as appropriated fund expenditures and would be subject to all statutes governing such expenditures. *See, e.g.,* . . . 31 U.S.C. § 1321(a)."). Accordingly, as with any federal agency expending appropriated funds, the BOP may apply Commissary Fund moneys "only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a); *see also* 1 United States General Accounting Office, Office of General Counsel, Principles of Federal Appropriations Law 4–2 (2d ed. 1991)

wise, nowhere in Circular No. 2244 is it unambiguously provided that the BOP has assumed fiduciary duties.

As discussed above, Circular No. 2244 makes clear that the BOP wields comprehensive authority over the management and operation of the commissaries and Commissary Fund. However, unlike the statutes and executive department regulations which were found to impose fiduciary obligations on the United States and define the contours of the United States' fiduciary responsibilities in *Mitchell II*, Circular No. 2244 does not mandate that the BOP act in the best interest of or for the benefit of inmates when operating the commissaries or administering the Commissary Fund.[12] As stated above, Circular No. 2244 also provides that "[n]o inmate shall be entitled to any portion of the earnings derived through operation of the 'Institutional Commissary'." *Id.* ¶22. Further, unlike the relationship held to be suggestive of a fiduciary relationship between the United States and Quinault Indians in *Mitchell II*, nothing in the history of the BOP's relationship with inmates concerning the Commissary Fund suggests the creation of a fiduciary relationship.

Based on our examination of 31 U.S.C. § 1321, its legislative history and Circular No. 2244, we conclude that the arrangement between the United States, inmates, and the Commissary Fund which we analyzed in the Randolph-Sheppard Memorandum as a common law trust does not, in fact, satisfy the requirements for a common law trust involving the United States as trustee set forth in *Mitchell I, Mitchell II*, and their progeny. Although the Commissary Fund was established to allow inmates the opportunity to purchase goods not ordinarily provided by federal prisons and moneys accruing to the Commissary Fund Treasury account do not belong to the United States in the same manner as miscellaneous receipts, nothing in Circular No. 2244 suggests that inmates have a property right in moneys accruing to the Commissary Fund or that the BOP is under a fiduciary obligation to the inmates as to the management and operation of the Commissary Fund.

Although we have established that 31 U.S.C. § 1321 and the rules set forth in Circular No. 2244 pertaining to the Commissary Fund do not impose fiduciary obligations on the BOP with respect to the Commissary Fund, we believe that 31 U.S.C. § 1321 and the rules set forth in Circular No. 2244 pertaining to the

---

[12] Instead of requiring the BOP to channel all or a portion of the profits from commissary operations into the Welfare Fund to be disbursed for the benefit of the inmate body as a whole, Circular No. 2244 merely affords the BOP the discretion to do so. *See* Circular No. 2244, § 41. It would be permissible under the rules for the BOP to channel all the profits from the operation of the commissaries back into the Commissary Fund for the future operation of the commissaries, and disburse no funds for the benefit of the inmate population as a whole. *See id.* § 16. Similarly, Circular No. 2244 provides:

The Warden or Superintendent at each institution may in his discretion authorize the selection by the inmates of a representative committee of . . . inmates who shall together with the Warden and the commissary clerk constitute an advisory committee who may make suggestions and recommendations to the end that the scheme herein outlined shall be conducted in the best interests of the institution and its inmates.

*Id.* § 20. Like the provision governing distribution of commissary profits for the welfare of the inmates, this provision is styled not as a mandate or an obligation, but merely as an option to the supervisor of each prison for seeking advice from the inmates on ways to improve the operation of the commissaries and Commissary Fund.

Prisoners' Trust Fund do impose fiduciary obligations on the BOP with respect to moneys contained in inmates' Prisoners' Trust Fund accounts. We base our conclusions on distinctions between the two "trust funds."

First, the moneys in inmates' Prisoners' Trust Fund accounts are truly personal funds. As stated above, each inmate's Prisoners' Trust Fund account contains money he or she brought into prison, received from a person outside the prison, or earned while in prison.[13] Accordingly, Circular No. 2244 establishes an elaborate accounting scheme to ensure that funds in inmates' Prisoners' Trust Fund accounts are properly credited, *see id.* ¶¶4–7,[14] and debited, *see id.* ¶¶8–10.

Second, unlike provisions of Circular No. 2244 pertaining to the commissaries and Commissary Fund, provisions pertaining to the Prisoners' Trust Fund require the BOP to act in the best interest of individual inmates in managing their Prisoners' Trust Fund accounts. Circular No. 2244 limits the amount of money that can be withdrawn monthly from inmates' Prisoners' Trust Fund accounts. However, it also provides that a prison warden may authorize larger monthly withdrawals for restitution or reparation of damages, payment of fines, remittance to a dependent in dire circumstances, books, tools or materials used for educational or vocational purposes, and payments to lawyers if the Warden deems it "necessary or for the best interest of an inmate and is satisfied that no abuse would result therefrom." *Id.* ¶8. Circular No. 2244 also provides that "[i]n no event shall any transfer from one inmate's account to that of another be permitted." *Id.* ¶9. Moreover, the Circular states that while food and clothing will no longer be accepted at federal prisons for use of inmates, "money may be received and placed to the credit of the individual inmates in the 'Prisoners' Trust Fund,' *to be used for their benefit* in accordance with rules and regulations herein provided." *Id.* ¶18 (emphasis added).

Third, the BOP has historically recognized fiduciary obligations with respect to inmates' Prisoners' Trust Fund accounts, generally refusing "to allow attachment or levy on the prisoners' trust funds as inconsistent with the provisions of the trust." Prisoners' Trust Fund Memorandum at 5. In affirming the BOP's understanding that it may not attach inmates' Prisoners' Trust Fund moneys to satisfy claims by the United States, this Office has stated that "[a] withdrawal

---

[13] Circular No. 2244 provides that "[a]ny inmate . . . may place a reasonable sum of money in the hands of the Warden or Superintendent of the institution, for credit to the inmate's personal account." *Id.* §2. Circular No. 2244 provides further that "[a]ny person may send a reasonable amount by check, money order, or cash, to be placed to the credit of an inmate." *Id.* §3. Moreover, Circular No. 2244 requires that an inmate's Prisoners' Trust Fund account be credited with any moneys earned by the inmate while employed in the prison. *Id.* §6.

[14] For example, paragraph 7 of Circular No. 2244 provides:

A receipt shall be furnished for all funds received for deposit in the "Prisoners, (sic) Trust Fund" from whatever source derived. Such receipts shall be prepared by the Accounting Section upon forms furnished for such purpose. The receipts shall go to the prisoners' fund accounting section for posting to the prisoners' personal accounts after which they will be sent to the inmates.

Similarly, paragraph 37 of Circular No. 2244 provides that "[e]ach month the Accounting Section shall prepare statements for the Director, Bureau of Prisons, Warden or Superintendent of the Institution and for the inmates who have been credited with money in the Prisoners' Trust Fund, in such manner and form as prescribed."

of [Prisoners' Trust Fund moneys] without the inmate's consent . . . would seem to constitute a breach of the terms of the trust." *Id.* at 11.

## III. CONCLUSION

For the foregoing reasons, we disavow that portion of our Randolph-Sheppard Memorandum which concludes that the BOP has a fiduciary obligation to inmates to expend Commissary Fund moneys only in a manner consistent with the terms of the Commissary Fund trust. In contrast, we conclude that the BOP is not under a fiduciary obligation to inmates concerning the management and operation of the Commissary Fund. In addition, we reaffirm the analysis contained in our Prisoners' Trust Fund Memorandum, but restrict the memorandum's application to statutory trusts, like the Prisoners' Trust Fund, which impose fiduciary obligations on the United States.

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*